1  WO

2

3

4

5

6

7              IN THE UNITED STATES DISTRICT COURT

8                 FOR THE DISTRICT OF ARIZONA

9

10

11

12  José Parra, Gonzalo Estrada,      )
    and Aurelia Martinez,             )
13                    Plaintiffs,     )      No. CIV-02-0591-PHX-RCB
14            vs.                     )          **O R D E R**
15  Bashas', Inc.                     )
16                    Defendant.      )
17  _____  )

18                    ***Introduction***

19        More than a decade ago, current and former Hispanic[1]

20  employees of defendant Bashas', Inc. filed this action

21  alleging race and national origin discrimination in violation

22  of Title VII of the 1964 Civil Rights Act as amended ("Title

23  VII"), 42 U.S.C. § 2000e, *et seq.*,  for both disparate impact

24  and disparate treatment, and intentional race discrimination

25  in violation of 42 U.S.C. § 1981.  Plaintiffs allege that

26  _____

27        [1]    Plaintiffs interchangeably refer to themselves as "Latino" or
    "Hispanic."  For the sake of uniformity, and because plaintiffs primarily
28  refer to themselves as Hispanics so too will this court.

Bashas' has discriminated against them with respect to pay and working conditions.  In 2005, this court denied certification of a pay class, but granted certification as to the working conditions claim.  <u>Parra v. Bashas', Inc.</u>, 2005 WL 6182338 (D. Ariz. 2005) ("<u>Parra I</u>").  In the ensuing years, for a host of reasons recounted below, this action has not moved beyond the class certification stage.  Pending before the court is the most recent permutation of the class certification issue.

### ***Background***

Bashas' Inc. operates three grocery store chains with three different formats and monikers:  A.J.'s Fine Foods ("A.J.'s"); (2) Bashas'; and (3) Food City.  In this putative class action, named plaintiffs Gonzalo Estrada,[2] a Hispanic former Food City hourly employee, and Aurelia Martinez, a Hispanic current Food City hourly employee,[3] allege that Bashas' pays its "predominantly" Hispanic Food City employees, less than it pays "the Caucasian employees at A.J.'s Fine Foods and Bashas' for performing the same work."  First Amended Complaint ("FAC") (Doc. 116) at 1:26-2:2, ¶ 1 ("the pay claim").  Plaintiffs further allege that the Food City Hispanic employees "are required to work under

---

[2]     As part of their motion for class certification, plaintiffs have submitted numerous declarations from current and former Hispanic hourly Food City employees.  José Agapito Perez Estrada provided one such declaration.  To clarify, all references herein to Estrada are to the named plaintiff, Gonzalo Estrada.

[3]     Originally, José Parra also was a named plaintiff, but he has since withdrawn, although he remains a member of the putative class.  <u>See</u> <u>Parra I</u>, 2005 WL 6182338, at *17 n. 31.

conditions that are typically less safe and less hygienic than the conditions found at A.J.'s . . . and Bashas'." _Id._ at 2:2-4, ¶ 1 ("the working conditions claim").

In _Parra I_, this court granted plaintiffs' motion for class certification pursuant to Fed.R.Civ.P. 23(b)(2) as to the working conditions claim, but denied certification of the pay claim, because there was not "sufficient commonality among the class members" as to the latter claim. _Parra I_, 2005 WL 6182338, at *16.  Commonality, as Rule 23(a)(2) requires for all class actions, was lacking because, as the parties conceded, "the contested pay scales ha[d] merged and, for the most part, are now identical."  _Id._ at *15 (citations omitted).

On appeal, the Ninth Circuit faulted this court for "only look[ing] at the current pay scales."  _Parra v. Bashas', Inc._, 536 F.3d 975, 979 (9th Cir. 2008) ("_Parra II_"), _cert. denied_, _Bashas', Inc. v. Parra_, 555 U.S. 1154, 129 S.Ct. 1050, 173 L.Ed.2d 470 (2009).  This court also should have "consider[ed] the evidence of past pay disparities and discrimination common to the Hispanic workers at Food City." _Id._  Taking that evidence into account, the Court found that the "pay scales were common for all Bashas', Inc. employees and provided for different pay for similar jobs based only on where the employee worked."  _Id._  Additionally, the Ninth Circuit pointed out that "[t]he class definition seeks to reach those Hispanic employees who suffered _past_ discrimination under th[o]se pay scales."  _Id._ (emphasis added). Given plaintiffs' "extensive evidence showing

Bashas', Inc.'s discriminatory pay practices commonly affected all members of the proposed class[,]" the Ninth Circuit reversed this court's commonality finding and remanded, instructing it to "consider[] . . . the remaining class certification factors[.]"   Id. at 979-980.

Thereafter, the issue of class certification as to the pay claim was in a state of legal limbo for quite a while. Bashas' filing of a voluntary Chapter 11 bankruptcy petition resulting in an automatic statutory stay, heavily contributed to that state, as did this court's decision to "defer resolution of the class certification issue pending a decision" in Wal-Mart Stores, Inc. v. Dukes, 603 F.3d 571 (9th Cir. 2010) ("Dukes II") (en banc), cert. granted, --- U.S. ---, 131 S.Ct. 795, 178 L.Ed.2d 530 (2010).  Ord. (Doc. 295) at 2:14-15 (citation omitted).  This court opted for deferral "rather than deciding the case in haste without the benefit of the Supreme Court's decision in Dukes[.]" Id. at 2:13-14.

Nearly three years after Parra II, the Supreme Court rendered its decision in Wal-Mart Stores, Inc. v. Dukes, 564 U.S. ___, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011) ("Dukes"). Vacating certification of a class estimated to include 1.5 million female current or former Wal-Mart employees, the Supreme Court held, inter alia, that plaintiffs did "not establish[] the existence of any common question[,]" as Rule 23(a)(2) requires.  Id. at 2557 (footnote omitted).  In accordance with this court's order, the parties then simultaneously filed supplemental briefs and replies with

-4-

1   respect to the potential impact of Dukes upon the present

2   case.   After considering all of the submissions filed with

3   respect to plaintiffs' 2004 motion for class certification,[4]

4   their positions during oral argument thereon, and the

5   parties' supplemental Dukes briefs, replies and other

6   filings, the court finds as follows.

### *Discussion*

8       Originally, plaintiffs sought class certification

9   pursuant to Fed.R.Civ.P. 23(b)(2) as to both the pay and the

10  working conditions claims; and in Parra I, this court

11  confined its analysis accordingly.   Now, however, in light of

12  Dukes, the plaintiffs are seeking certification of the pay

13  claim pursuant to Fed.R.Civ.P. 23(b)(3).   Furthermore, also

14  in light of Dukes, Bashas' is requesting that this court

15  reconsider its decision certifying the working conditions

16  claim, and decertify that claim.   The court will address the

17  myriad of issues surrounding class certification as to each

18  of these two claims separately, beginning with the pay claim.

19  But first, the court will outline the legal framework for its

20  analysis.

### *I.   Class Certification Legal Framework*

22      Rule 23 "give[s] the district court broad discretion

23  over certification of class actions[.]"   Stearns v.

24  Ticketmaster Corp., 655 F.3d 1013, 1019 (9th Cir. 2011).

_____

25      [4]      In 2004, the class certification motion, the response, the reply
26  and some supporting documentation were all filed under seal.   Given "the
    extreme passage of time[,]" as Bashas' notes, "much of the information no
27  longer is sensitive."   Defs.' Supp. Br. (Doc. 301) at 2:25, n. 1.   Thus, to
    the extent the parties have relied upon any sealed documents, so, too has
28  the court.

However, class certification remains "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" Comcast Corp. v. Behrend, --- U.S. ----, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013) (quoting Califano v. Yamasaki, 442 U.S. 682, 700-701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). "[T]o justify a departure from that rule, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Dukes, 131 S.Ct. at 2550 (internal quotation marks and citations omitted).

The Dukes Court made clear that "Rule 23 does not set forth a mere pleading standard." Dukes, 131 S.Ct. at 2551. Therefore, "a party seeking to maintain a class action 'must affirmatively demonstrate . . . compliance' with Rule 23." Comcast, 133 S.Ct. at 1432 (quoting Dukes, 131 S.Ct. at 2551-2552). That means, "a party must . . . 'be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)." [5]

---

[5]    "The Supreme Court . . . has yet to decisively attach a standard of proof to Rule 23 requirements[,]" Keegan v. American Honda Motor Co., 284 F.R.D. 504, 521 n. 83 (C.D.Cal. 2012) (internal quotation marks and citation omitted), even after its two most recent class action decisions, Amgen Inc. v. Conn. Ret. Plans and Trust Funds, --- U.S. ----, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013), and Comcast. Similarly, the Ninth Circuit has not yet been squarely confronted with this burden of proof issue. Among the Circuit Courts to have addressed the issue, a consensus is emerging around the "preponderance of the evidence" standard. See, e.g., Levitt v. J.P. Morgan Securities, Inc., 710 F.3d 454, 465 (2nd Cir. 2013) (internal quotation marks and citation omitted) (emphasis added) ("The Rule 23 requirements must be established by at least a preponderance of the evidence."); Messner v. Northshore Univ. HealthSystem, 669 F.3d 802, 811 (7th Cir. 2012) (citations omitted) ("Plaintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements, . . . , but they need not make that showing to a degree of absolute certainty. It is

1  Id.  (quoting Dukes, 131 S.Ct. at 2551) (emphasis in

2  original).  Satisfying those prerequisites, "effectively

3  limit[s] . . . class claims to those fairly encompassed by

4  the named plaintiff's claims." Dukes, 131 S.Ct. at 2550

5  (internal quotation marks and citations omitted).

6      When analyzing the propriety of class certification, the

7  Supreme Court has "[r]epeatedly . . . emphasized that it

8  ''may be necessary for the court to probe behind the

9  pleadings before coming to rest on the certification

10  question,' and certification is proper only if 'the trial

11  court is satisfied, after a rigorous  analysis, that the

12  prerequisites of Rule 23(a) have been satisfied.''" Comcast,

13  133 S.Ct. at 1432 (quoting Dukes, 131 S.Ct. at 2551 (quoting

14  in turn General Telephone Co. of Southwest v. Falcon, 457

15  U.S. 147, 160-161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

16  The exact contours of a "rigorous analysis," as well as the

17  extent to which courts may "probe behind the pleadings[,]" is

18  still evolving.  What is certain though is that a rigorous

19  analysis "will frequently entail 'overlap with the merits of

20  the plaintiff's underlying claim.'"  Id. (quoting Dukes, 564

21  _____

22  sufficient if each disputed requirement has been proven by a preponderance
    of evidence."); In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 320

23  (3d Cir. 2008) ("a district court exercising proper discretion in deciding
    whether to certify a class will resolve factual disputes by a preponderance

24  of the evidence and make findings that each Rule 23 requirement is met or
    is not met[]").  However, that view is not universally held.  See Gooch v.

25  Life Investors, Co. of Am., 672 F.3d 402, 418 n. 8 (declining
    "preponderance of the evidence" standard for the "rigorous analysis"

26  mandated by Dukes and Falcon).
        Absent specific guidance from the Supreme Court or the Ninth Circuit,

27  the court, "see[s] no reason to superimpose a more specific standard than
    the Supreme Court[.]" See Gooch, 672 F.3d at 418 n. 8.  This is especially

28  so because "factual issues are not in play[]" in that Bashas' concessions
    provide the primary factual basis, at least with respect to plaintiffs' pay
    claim.  See id.

U.S. at ----, 133 S.Ct. at 2551).  "That is so because the 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" Id.  (quoting Dukes, 564 U.S., at ----, 131 S.Ct. at 2551) (other quotation marks and citation omitted).

Post-Dukes, the Ninth Circuit has stressed that "a district court *must* consider the merits if they overlap with the Rule 23(a) requirements.") Ellis v. Costco Wholesale Corp., 657 F.3d 970, 981 (9th Cir. 2011) ("Ellis I") (emphasis in original) (citations omitted).  Indeed, the Supreme Court has recently cautioned that "Rule 23 grants no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent – but only to the extent - that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen, 133 S.Ct. at 1194-95; see also Comcast, 133 S.Ct. 1426.  "To hold otherwise would turn class certification into a mini-trial." Ellis I, 657 F.3d at 983 n. 8.  This court thus will "not turn the[s]e class certification proceedings into a dress rehearsal for the trial on the merits." See Messner v. Northshore University HealthSystem, 669 F.3d 802, 811 (7th Cir. 2012) (citations omitted).

That said, neither "the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis

for declining to certify a class which apparently satisfies [Rule 23]." <u>United Steel, Paper & Forestry, Rubber, Manufacturing Energy, Allied Industrial & Service Workers International Union v. ConocoPhillips Co.</u>, 593 F.3d 802, 809 (9th Cir. 2010). "[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable." <u>Falcon</u>, 457 U.S. at 161. Consequently, "a court is not required to "unquestioningly accept a plaintiff's arguments as to the necessary Rule 23 determinations." <u>Gonzales v. Comcast Corp.</u>, 2012 WL 10621, at *9 (E.D.Cal. Jan. 3, 2012) (internal quotation marks and citation omitted), <u>adopted in full</u>, 2012 WL 217708 (E.D.Cal. Jan. 23, 2012).

Once all four prerequisites of Rule 23(a) are shown, "the party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." <u>Comcast</u>, 133 S.Ct. at 1432. In the present case, the provision at issue is subsection three, which requires a court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). Leaving no doubt, the <u>Comcast</u> Court expressly held that "[t]he same analytical principles[,]" outlined above, requiring a rigorous analysis and "frequently entail[ing] some overlap with the merits[,] . . . govern Rule 23(b)." <u>Comcast</u>, 133 S.Ct. at 1432 (citation omitted). These principles form the backdrop for the pending issue of whether to certify a class as to plaintiffs' pay claim, and also whether to decertify the class as to their working conditions claim.

## II.  *Pay Claim*

### A.  *Fed.R.Civ.P. 23(a)*

#### 1.  *Numerosity*

Numerosity, the first prerequisite for class certification under Rule 23(a), is shown when "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). In Parra I, Bashas' did not contest certification based upon a lack of numerosity, and the putative class has  "thousands of members[.]" See Parra I, 2005 WL 6182338, at *14 (citations omitted).  The plaintiffs thus have readily shown numerosity.  Further, because Bashas' did not contest numerosity on appeal, nor does Bashas' raise that issue now, the court adheres to that earlier finding. Consequently, the court is free to turn to the vigorously disputed issue of whether, in the wake of Dukes, plaintiffs have met their burden of showing commonality as to their pay claim.

#### 2.  *Commonality*

The second requirement under Rule 23(a) is the existence of "questions of law or fact common to the class[.]" Fed.R.Civ.P. 23(a)(2).  Commonality under that Rule was "[t]he crux" of  Dukes, 131 S.Ct. at 2550.  In the present case, the parties strenuously disagree as to the applicability of Dukes, especially given the procedural posture of this case -- on remand after a finding of commonality.  From Bashas' perspective, Dukes "substantially restated the standard for establishing commonality[.]" Def.'s Resp. (Doc. 304) at 5:20, n. 1 (citations omitted).  Strongly

1   implying that because <u>Dukes</u> constitutes an intervening change

2   in law, Bashas' further argues that "[n]either the law of the

3   case doctrine nor the mandate rule" require this court to

4   abide by the Ninth Circuit's finding of commonality in <u>Parra</u>

5   <u>II</u>.  <u>Id.</u> at 5:19, n. 1.  Hence, Bashas' believes that after

6   <u>Dukes</u> "it is not only proper but necessary [for this court]

7   to revisit Plaintiffs' ability to show commonality."  <u>Id.</u> at

8   5:23, n. 1.

9        To the contrary, plaintiffs argue that the Ninth

10  Circuit's finding of commonality in <u>Parra II</u> "is unaffected"

11  by <u>Dukes</u>. Pls.' Supp. Br. (Doc. 302) at 16:11.  Therefore,

12  plaintiffs assert that Bashas' is "effect[ively] . . .

13  urg[ing] this Court to ignore the mandate of the Ninth

14  Circuit."  Pls.' Reply (Doc. 303) at 6:5-6 (citation

15  omitted).  Skirting the critical issue of whether <u>Dukes</u>

16  amounts to a change in controlling law, plaintiffs first

17  observe that the <u>Parra II</u> Court "did not rely on any of the

18  Ninth Circuit's rulings in *Wal-Mart*, now reversed by the

19  Supreme Court["] in <u>Dukes</u>.  <u>Id.</u> at 16:12-13.  While obviously

20  true,[6] it does not necessarily follow that because of that

21  <u>Dukes</u> is not an intervening change in law, as plaintiffs

22  suggest.

23       Plaintiffs add that <u>Dukes</u> and the present case "raise

24  different commonality issues."  <u>Id.</u> at 16:14.  Assuming that

25  is so, it also does not necessarily follow therefrom that

26  <u>Dukes</u> does not constitute an intervening change in law.  Put

27

28       [6]   Given that <u>Parra II</u> was decided in 2008, it would have been
     impossible for that Court to have relied upon the Ninth Circuit's 2010
     <u>Dukes</u> decision.

differently, it is possible that <u>Dukes</u> is an intervening

change in law, regardless of the nature of the commonality

issues.  Plaintiffs' final response is that "the policy issue

in this case is precisely the kind of 'specific employment

practice' found lacking by the Supreme Court in [<u>Dukes</u>]."

<u>Id.</u> at 16:19-21.  Still, this is not directly responsive to

the change in law issue.

### *a. Law of the Case/Rule of Mandate*

It is well settled in this Circuit that "'[w]hen a case

has been decided by an appellate court and remanded, the

court to which it is remanded must proceed in accordance with

the mandate and such law of the case as was established by

the appellate court.'" <u>United States v. Luong</u>, 627 F.3d 1305,

1309 (9th Cir. 2010) (quoting <u>Firth v. United States</u>, 554 F.2d

990, 993 (9th Cir. 1977)). Pursuant to the law of the case, "a

court will generally refuse to reconsider an issue that has

already been decided by the same court or a higher court in

the same case." <u>Gonzalez v. Arizona</u>, 677 F.3d 383, 389 n. 4

(9th Cir. 2012) (citation omitted) (en banc), <u>cert.</u> <u>granted</u>, -

-- U.S. ----, 133 S.Ct. 476, 184 L.Ed.2d 296 (2012).   The

law of the case doctrine applies when, *inter alia*, "the issue

in question [was] decided explicitly . . . in the previous

disposition." <u>United States v. Thrasher</u>, 483 F.3d 977, 981

(9th Cir. 2007).  Plainly, "the issue in question" here –

whether plaintiffs met Rule 23(a)(2)'s commonality standard –

was explicitly decided in <u>Parra II</u>.  Thus, prior to <u>Dukes</u>,

the Ninth Circuit's finding of commonality in <u>Parra II</u> would

have been binding upon this court, and the law of the case

doctrine would have barred reconsideration of that issue on remand.

The same result holds true with respect to the rule of mandate, which "is similar to, but broader than, the law of the case doctrine." See id. at 982 (internal quotation marks and citation omitted). "The Supreme Court long ago emphasized that when acting under an appellate court's mandate, an inferior court 'cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon any matter decided upon appeal; or intermeddle with it, further than to settle so much as has been remanded.'" Matter of Beverly Hills Bancorp, 752 F.2d 1334, 1337 (9th Cir. 1984) (quoting In re Sanford Fork & Tool Co., 160 U.S. 247, 255, 16 S.Ct. 291, 293, 40 L.Ed. 414 (1895)).  Prior to Dukes, the rule of mandate would have deprived this court of jurisdiction to revisit on remand the Parra II commonality finding.  See Luong, 627 F.3d at 1309 (internal quotation marks and citation omitted) ("[I]f a district court errs by violating the rule of mandate, the error is a jurisdictional one[.]") That is so because in reversing this court's "finding that Plaintiffs' originally proposed class lacked commonality under Rule 23(a)(2)," the Ninth Circuit explicitly remanded "for consideration of the remaining class certification factors in accordance with [its] opinion." Parra II, 536 F.3d at 980 (emphasis added).

Importantly, there is some flexibility with respect to the rule of mandate and law of the case doctrines.  Indeed,

Ninth Circuit "cases make clear that the rule of mandate is designed to permit flexibility where necessary, *not* to prohibit it." U.S. v. Kellington, 217 F.3d 1084, 1095 n. 12 (9th Cir. 2000) (emphasis added).  The Ninth Circuit likewise has recognized that the "[l]aw of the case should not be applied woodenly in a way inconsistent with substantial justice." United States v. Miller, 822 F.2d 828, 832-33 (9th Cir. 1987); see also Yankee Atomic Electric Co. v. United States, 679 F.3d 1354, 1360 (Fed. Cir. 2012) internal quotation marks and citations omitted) ("An appellate mandate does not turn a district judge into a robot, mechanically carrying out orders that become inappropriate in light of subsequent factual discoveries or changes in the law.")

Given that inherent flexibility, there are exceptions warranting a departure from the law of the case and rule of mandate doctrines.  Among other reasons, a court has discretion to depart from the law of the case doctrine based upon "intervening controlling authority [which] makes reconsideration appropriate[.]" United States v. Jingles, 682 F.3d 811, 820 (9th Cir. 2012) (internal quotation marks and citations omitted). Further, because "[t]he mandate rule is a subpart of the law of the case doctrine[,]" . . . the mandate rule is subject to the same exceptions[]" as the law of the case doctrine. American Express Travel Related Serv. Co. v. Fraschilla (In re Fraschilla), 235 B.R. 449, 457 (9th Cir. BAP 1999), aff'd, 242 F.3d 381 (9th Cir. 2000) (citing Miller, 822 F.2d at 832).  Hence, because the "Ninth Circuit has identified . . . an intervening change in the law" as one

of several "circumstances in which the law of the case doctrine," need not be applied, "*by analogy* the rule of mandate doctrine[] [also] need not be applied[]" when there has been such a change in the law.  <u>See</u>   <u>Allen v. Astrue</u>, 2010 WL 4825925, at *5 (C.D.Cal. 2010) (emphasis added) (citing cases).

In the present case, the issue thus becomes whether, as Bashas' contends, <u>Dukes</u> constitutes an intervening change in the controlling law so as to permit departure from the rule of mandate and law of the case doctrines.  <u>See Fraschilla</u>, 235 B.R. at 455 (citing cases)("[T]rial courts are permitted on remand to consider whether any exceptions to the law of the case doctrine excuse compliance with a determination made by an appellate court.")   In its first application of <u>Dukes</u>, the Ninth Circuit sweepingly declared it to be "new precedent altering existing case law[,]" requiring remand to the district court.  <u>Ellis I</u>, 657 F.3d at 974.  The Ninth Circuit in <u>Ellis</u> vacated and remanded a grant of class certification in a Title VII action alleging gender discrimination by the defendant employer in its promotion and management practices. Admittedly, the <u>Ellis I</u> Court was not faced with the precise issue before this court: whether <u>Dukes</u> is a change in controlling law so as to permit deviating from the law of the case and rule of mandate doctrines.  Nonetheless, the Ninth Circuit's broad declaration in <u>Ellis I</u> is a strong signal that it views <u>Dukes</u> as changing the legal landscape with respect to class certification.

Reinforcing this view is the Ninth Circuit's more recent

1  decision in <u>Wang v. Chinese Daily News, Inc.</u>, 709 F.3d 829

2  (9th Cir. 2013).  There, the plaintiffs argued that the

3  defendant had "waived its right to challenge the district

4  court's commonality finding because its opening brief, filed

5  before . . . *Wal-Mart*, discussed the existence of common

6  questions only in arguing against Rule 23(b)(3)

7  certification."  <u>Id.</u> at 833.  The defendant "did not argue

8  the issue of commonality in its discussion of Rule 23(a)."

9  <u>Id.</u>  "Generally, an issue is waived when the appellant does

10  not specifically and distinctly argue the issue in his or her

11  opening brief."  <u>Id.</u> (internal quotation marks and citation

12  omitted).  However, invoking the settled rule that an

13  appellate court "may consider new arguments . . . if the

14  issue arises because of an intervening change in law[,]" the

15  Ninth Circuit "conclude[d] that the [Supreme] Court's

16  decision in *Wal-Mart* present[ed] a sufficiently significant

17  legal development to excuse any failure of [the defendant] to

18  discuss the commonality requirement of Rule 23(a)(2) in its

19  opening brief."  <u>Id.</u>

20      The Ninth Circuit is not alone in its view that <u>Wal-Mart</u>

21  is "new precedent altering existing case law[,]" <u>Ellis I</u>, 657

22  F.3d at 974, or a "significant legal development[.]"  <u>See</u>

23  <u>Wang</u>, 709 F.3d at 833.  Other courts, including district

24  courts within this Circuit, have variously recognized that

25  <u>Dukes</u>: (1) sets forth a "heightened standard of

26  commonality[;]"[7] (2) "represents a significant restatement of

27

28      [7]   <u>See</u> <u>Morrison v. Anadarko Petroleum Corp.</u>, 280 F.R.D. 621
    (W.D.Okla. 2012) (refusing to give preclusive effect to a state court class
    certification order because that court "did not apply the heightened

the commonality requirement[;]"[8]  (3) clarifies the Rule

23(a) commonality element;[9] and (4) "undoubtedly increas[es]

the burden on class representatives by requiring that they

identify *how* common points of facts and law will drive or

resolve the litigation[.]"[10]  Partially based upon this

weight of authority, the court is convinced that <u>Dukes</u>

represents an intervening change in law.

Additionally, an independent examination of <u>Dukes</u>

further convinces this court that the Supreme Court altered

the legal standards for assessing commonality by, among other

things, adding an additional level of scrutiny under Rule

23(a)(2).  More specifically, <u>Dukes</u> adopted the view that

"[w]hat matters to class certification . . . is not the

_____

standard of commonality as set forth in *Dukes*[]").

[8]    <u>Walter v. Hughes Communications, Inc.</u>, 2011 WL 2650711, at *7
(N.D.Cal. 2011).

[9]    <u>See</u>, <u>e.g.</u>, <u>Ellis I</u>, 657 F.3d at 974 ("Several of the[] issues
["relating to class certification[]"] have recently been clarified by
<u>Dukes</u>); <u>Ross v. RBS Citizens, N.A.</u>, 667 F.3d 900, 902 (7th Cir. 2012)
("[T]he Supreme Court clarified the Rule 23(a) commonality element in"
<u>Dukes</u>); <u>Sanchez v. Sephora USA, Inc.</u>, 2012 WL 2945753, at *3 (N.D.Cal.
2012) (same); <u>In re Wells Fargo Residential Mortg. Lending Discrimination
Litigation</u>, 2011 WL 3903117, at *2 (N.D.Cal. 2011) (same).
    This court is keenly aware that in attempting to define what
constitutes an intervening change in controlling law, it has previously
found that "cases which merely confirm, clarify or explain existing case
law" do not amount to such a change.  <u>Teamsters Local 617 Pension and
Welfare Funds v. Apollo Group, Inc.</u>, 282 F.R.S. 216, 224 (D.Ariz. 2012).
Significantly, however, in <u>Apollo Group</u> this court was examining what
constitutes an intervening controlling law for purposes of determining
whether to alter or amend a judgment under Rule 59(e), and it limited its
finding accordingly.  The interests of finality and conservation, which are
of paramount importance in that context, <u>Carroll v. Nakatani</u>, 342 F.3d 934,
945 (9th Cir. 2003), are not implicated here.  Moreover, as can be seen,
clarification is just one of many ways in which courts have described
<u>Dukes</u>' influence on Rule 23(a)(2)'s commonality standard.

[10]    <u>Gonzales</u>, 2012 WL 10621, at *10 (citation omitted) (emphasis in
original).

1   raising of common 'questions' — even in droves — but, rather

2   the capacity of a classwide proceeding to generate common

3   *answers* apt to drive the resolution of the litigation."

4   <u>Dukes</u>, 131 S.Ct. at 2551 (internal quotation marks and

5   citation omitted) (emphasis in original).  Consequently, in

6   its discretion, and given "the contours of the situation and

7   common sense[,]" this court finds it appropriate to revisit

8   the commonality issue, notwithstanding the Ninth Circuit's

9   resolution of that issue in <u>Parra II</u>.[11]

10      <u>Hegler v. Borg</u>, 50 F.3d 1472 (9th Cir. 1995) ("<u>Hegler</u>

11   <u>II</u>"), is closely analogous, and provides additional support

12   for reexamining the commonality issue in light of <u>Dukes</u>.

13   Reversing and remanding, in <u>Hegler v. Borg</u>, 990 F.2d 1258 (9th

14   Cir. 1993),  the Ninth Circuit instructed the district court

15   to determine whether a particular error was harmless beyond a

16   reasonable doubt.  On remand, the district court "disobeyed

17   the instruction in the mandate because an intervening Supreme

---

18      [11]    To a certain extent, the court finds itself in the position, so

19   aptly described by the <u>Fraschilla</u> court:

20          In effect, when there has been an intervening
            authoritative decision of a higher appellate court

21          [*i.e.*, <u>Dukes</u>] to which both the lower appellate court
            that issued the mandate [*i.e.*, <u>Parra III</u>] and th[is]

22          trial court owe obedience, then the trial court is
            presented with the dilemma of a clash between the

23          dictates of the doctrine of *stare decisis* and the
            imperative of the mandate rule. The correct choice

24          depends upon the contours of the situation and common
            sense. It is no more comfortable for the trial court than

25          it is for the private soldier who receives contradictory
            orders from the sergeant and the captain or the employee

26          caught between a middle manager and a top executive.

27   <u>Fraschilla</u>, 235 B.R. at 458.

28

Court decision prescribed a different standard." Fraschilla,
235 B.R. at 458. In Hegler II, another Ninth Circuit panel
agreed that it "must apply intervening Supreme Court
authority to a subsequent appeal[]" as an exception to the
law of the case doctrine. Hegler II, 50 F.3d at 1478.
Therefore, the Hegler II Court "had no difficulty affirming
the [district] court[]" despite that court's disregard of the
mandate and the law of the case. See Fraschilla, 235 B.R. at
458 (citation and footnote omitted).

Southern Oregon Barter Fair v. Jackson County, 372 F.3d
1128 (9ᵗʰ Cir. 2004), and Fraschilla, 235 B.R. 449, are also
instructive as to when a district court may depart from the
mandate and law of the case. In Barter Fair, the Court held
that it was not an abuse of discretion to re-examine the
merits after the issuance of a preliminary injunction,
notwithstanding the law of the case, because an intervening
Supreme Court decision "provided important guidance" therein.
Barter Fair, 372 F.3d at 1136.

Similarly, in Fraschilla, 235 B.R. 449, the Bankruptcy
Appellate Panel ("BAP") held that although its mandate had
directed entry of judgment in plaintiff's favor, the trial
court did not err by subsequently conducting a trial where,
following remand, there had been two intervening Ninth
Circuit decisions. One such decision "amplified the
importance of the other elements of [nondischargeability for]
common law fraud." Id. at 456. The second intervening
decision, while "somewhat opaque," "adjusted the focus" for a
finding of nondischargeability, "emphasiz[ing] the need to

1    make an actual finding regarding intent[.]" <u>Id.</u> Those two

2    decisions change[d] the landscape regarding credit card

3    nondischargeability actions . . . alter[ing] the analysis

4    that was applicable when the BAP decided the initial

5    appeal[]" therein.  <u>Id.</u> at 455.  As <u>Barter Fair</u> and

6    <u>Fraschilla</u> demonstrate, even if an intervening decision does

7    not go so far as to "prescribe a different standard,"

8    nonetheless, such a decision can warrant a departure from the

9    rule of mandate and law of the case doctrines.  <u>See</u>

10   <u>Fraschilla</u>, 235 B.R. at 458.

11        Ultimately, as plaintiffs assert, the <u>Parra II</u> Court's

12   finding of commonality (as distinguished from its rationale)

13   might be "unaffected."  Pls.' Supp. Br. (Doc. 302) at 6:13

14   (citation omitted).   It also may be, as plaintiffs assert,

15   that <u>Dukes</u> "does not require a re-examination of [prior]

16   <i>factual</i> findings[] in this case.  <u>See</u> Pls.' Reply (Doc. 303)

17   at 6:8-9 (emphasis added).  Nevertheless, this court cannot

18   disregard <u>Dukes</u>, which altered the legal standards for

19   assessing Rule 23(a)(2) commonality.

20                        **b.  Dukes**

21        The <u>Dukes</u> plaintiffs alleged "that the discretion

22   exercised by their local supervisors over pay and promotions

23   matters violate[d] Title VII by discriminating against

24   women."  <u>Dukes</u>, 131 S.Ct. at 2547.  The <u>Dukes</u> plaintiffs

25   attempted to demonstrate the common issue of company-wide

26   gender discrimination chiefly through three different "forms

27   of proof[.]" <u>Dukes</u>, 131 S.Ct. at 2549.  First, the plaintiffs

28   relied upon "statistical evidence about pay and promotion

disparities between men and women at the company[.]" Id.
Second, they relied upon "anecdotal reports of discrimination
from about 120 of Wal-Mart's female employees[.]"  Id.
Third, the plaintiffs relied upon "the testimony of a
sociologist, . . . , who conducted a 'social framework
analysis' of Wal-Mart's 'culture' and personnel practices,
and concluded that the company was 'vulnerable' to gender
discrimination." Id. (citation omitted).  In dismantling the
nation-wide class, a five justice majority in Dukes held that
plaintiffs did not show commonality because they did not
"provide . . . convincing proof of a companywide
discriminatory pay and promotion policy[,]" and hence they
did "not establish[] the existence of any common question[,]"
as Rule 23(a)(2) mandates.  Id. at 2556-57.

Summarizing the commonality requirement, Justice Scalia
wrote, that it "requires the plaintiff to demonstrate that
the class members 'have suffered the same injury[,]'" not
"merely that they have all suffered a violation of the same
provision of law."  Id. at 2551 (quoting Falcon, 457 U.S. at
157, 102 S.Ct. 2364).  To show that they have suffered the
same injury, plaintiffs' "claims must depend upon a common
contention," according to the Dukes Court. Id.   That common
contention, in turn, "must be of such a nature that it is
capable of classwide resolution - which means that
determination of its truth or falsity will resolve an issue
that is central to the validity of each [claim] in one
stroke."  Id.  Such a common contention was missing in Dukes
because there was not "some glue holding the alleged *reasons*

for all [of] those [individual employment] decisions together[.]" _Id._ at 2552 (emphasis in original).  Therefore, it would "be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question _why was I disfavored_." _Id._ (emphasis in original).

Rejecting plaintiffs' statistical evidence, the _Dukes_ Court found that "[e]ven if . . . taken at face value," such evidence was "insufficient to establish that [plaintiffs'] theory c[ould] be proved on a classwide basis." _Id._ at 2555. "Merely showing that Wal-Mart's policy of discretion had produced an overall sex-based disparity does not suffice." _Id._ at 2556.  The "more fundamental" failure in plaintiffs' proof though was their failure to "identif[y]" [a] 'specific employment practice' - - much less one that ties all their 1.5 million claims together." _Id._ at 1255-56.  Plaintiffs' anecdotal evidence in _Dukes_ was similarly defective and "too weak to raise an inference that all the individual, discretionary personnel decisions are discriminatory[,]" because it did not focus on particular Wal-Mart stores.  _Id._ Thus, because the plaintiffs did not provide "convincing proof of a companywide discriminatory pay and promotion policy," the _Dukes_ Court held that they did "not establish[] the existence of any common question." _Id._ (footnote omitted).

### *c. Analysis*

Before considering whether plaintiffs have shown commonality post-_Dukes_, it is necessary to clarify the scope

of their pay claim.  Since seeking class certification in 2004, plaintiffs have severely restricted the scope of that claim.  Originally, plaintiffs' pay claim had encompassed a pay policy purporting to have "elements of local manager subjectivity[,]" Pls.' Supp. Br. (Doc. 302) at 18:27, n. 9, the so-called, "Subjective Placement claim[.]" Pls.' Reply (Doc. 303) at 5:16-17.  Plaintiffs unequivocally declare that they "did not pursue that policy on . . . appeal . . . and no longer seek certification of that claim[,]" however.  Pls.' Supp. Br. (Doc. 302) at 18:27-28, n. 9.

Another component of plaintiffs' pay claim had been Bashas' alleged failure to pay Sunday premiums to Food City employees.  Plaintiffs make only "passing reference" to the Sunday premiums; and, more importantly, they have not come forth with any factual support for this claim, as Bashas' accurately notes.  See Def.'s Supp. Br. (Doc. 301) at 2:26, n. 2 (citation omitted).  Furthermore, as Bashas' also correctly notes, "[p]laintiffs never raised this [issue] again and neither this Court nor the [Ninth] Circuit . . . addressed it." Id. at 2:27-28, n. 2.  Plaintiffs have, therefore, implicitly abandoned the Sunday premiums aspect of their pay claim.  Through their actions or, as the case may be, inaction, plaintiffs' pay claim now consists solely of what they describe as Bashas' "written Two-Tiered Wage Scale [("the wage scale")][.]"[12]  Pls.' Reply (Doc. 303) at 5:17-18.

---

[12]  Bashas' twice acknowledges that plaintiffs are challenging its pay scales.  See Def.'s Supp. Br. (Doc. 301) at 9:19-20 (citations omitted) (emphasis added) (identifying "Bashas' pay scales[]" as "the *actual employment practice challenged* in this case[]"); and id. at 10:19-20 (emphasis added) (defining the "issue at hand[]" as whether the *challenged*

1    The court will limit its analysis accordingly.

2         Plaintiffs are pursuing two closely related, although

3    not identical, theories of discrimination with respect to

4    Bashas' wage scales – disparate treatment and disparate

5    impact.[13]   See Pls.' Supp. Br. (Doc. 302) at 17:28-18:2.

6    Borrowing from Dukes, plaintiffs assert that they do have a

7    common answer to the "crucial question" posed therein, "[w]hy

8    was I disfavored?"   See Dukes, 131 S.Ct. at 2552 (emphasis in

9    original).   The common answer, plaintiffs posit, is because

10   Bashas' "adopted a lower wage scale for predominantly

11   Hispanic Food City employees doing the same work as their

12   white counterparts at Bashas' and A.J.'s Fine Foods."  Pls.'

13   Supp. Br. (Doc. 302) at 17:26-28.  Thus, regardless of which

14

15   _____

     pay scales constitute a discriminatory practice[]").  Yet, in its reply
16   Bashas' seems to disavow that view, declaring that  "[w]hile Plaintiffs
     claim to challenge [its] pay scales, in reality, they [are] rely[ing] on
17   statistically derived average pay differences between Hispanic Food City
     employees and their counterparts working in other Bashas' formats." Def.'s
18   Resp. (Doc. 304) at 3:3-5 (emphasis in original).  Even assuming arguendo
     that is so, it does not change the fact that plaintiffs' equal pay claim
19   centers on Bashas' wages scales themselves.

20        [13]   For the most part, the parties have overlooked the distinction
21   between these two theories.  For example, in its reply Bashas' outlines the
     legal framework for a prima facie case of disparate impact, Def.'s Resp.
22   (Doc. 304) at 4:1-22, but it seems to couch its Dukes-based arguments in
     terms of disparate treatment, not disparate impact.
23        Bashas' is not alone in this tendency.  Even though they are pursuing
     both, plaintiffs did not  separately analyze disparate impact and disparate
24   treatment in terms of commonality or otherwise.  Cf. Ellis v. Costco
     Wholesale Corp., 285 F.R.D. 492, 510 (N.D.Cal. 2012) ("Ellis II")
25   ("[B]ecause there are differences with respect to the way Dukes might be
     applied to disparate treatment, as opposed to disparate impact claims, the
26   Court . . . address[ed] these claims separately[.]")  Following the
     parties' lead, and without the advantage of their fully briefed views on
27   this issue, this court, too, will not distinguish between disparate
     treatment and disparate impact at this stage.  That does not foreclose the
28   possibility that that distinction will become relevant later in this
     litigation.

theory their pay claim is grounded upon, plaintiffs contend
that they have met Dukes' commonality standard because
"[r]esolution of whether Bashas' [pay] policy violates Title
VII and Section 1981 . . . will resolve the question for all
class members." Id. at 17:23-25.

Bashas' responds that commonality is lacking because, as
in Dukes, the plaintiffs "cannot provide proof of a
companywide discriminatory pay practice." Def.'s Supp. Br.
(Doc. 301) at 12:24 (emphasis omitted). Bashas' further
responds that, also like Dukes, neither plaintiffs'
statistical nor their anecdotal evidence suffice to establish
commonality.   Patterning its argument after the evidentiary
shortcomings in Dukes only serves to lay bare the flaws in
Bashas' commonality analysis, however.   Although Bashas'
assails the evidence of plaintiffs' statistician, Dr. Richard
Drogin, it cannot now distance itself from "three significant
. . . conce[ssions]" it made earlier in this litigation. See
Parra II, 536 F.3d at 979. Bashas' retained Dr. Michael P.
Ward, an economist and statistician, to refute Dr. Drogin's
statistical analyses.   Dr. Ward  conceded these conclusions
reached by Dr. Drogin:

> (1) Food City Stores have a higher
> percentage of Hispanic employees
> compared to Bashas' or A.J.'s stores,
> (2) the pay scales at Bashas' and A.J.'s
> stores were higher than those at Food City
> during the period 1998-2000, and (3)
> Hispanic employee hourly rates were
> lower in similar jobs.

Id.; see also Parra I, 2005 WL 6182338, at *16 (same).
Bashas' wage scales, in combination with these concessions,
provide the "convincing proof of a companywide discriminatory

1  pay . . . policy" missing from _Dukes_.   See _Dukes_, 131 S.Ct.

2  at 2556.

3       Indeed, even prior to _Dukes_, the Ninth Circuit was

4  similarly convinced, explaining that:

5            These pay scales were common for all Bashas',
             Inc. employees and provided for different
6            pay for similar jobs based only on the store
             where the employee worked.  The proposed class
7            here shares the alleged discriminatory pay
             scales of Bashas', Inc.  The class definition
8            seeks to reach those Hispanic employees who
             suffered past discrimination under these pay
9            scales.

10  _Parra II_, 536 F.3d at 979.  The foregoing seriously erodes

11  Bashas' assertion that  plaintiffs have not shown commonality

12  because Dr. Drogin "fail[ed] to "identify . . . a 'specific

13  employment practice' or one that impacts all of the

14  individuals in the proposed class."  Def.'s Supp. Br. (Doc.

15  301) at 10:24-26 (citing _Dukes_, 131 S.Ct. at 2555).

16       Relatedly, the foregoing also deeply undercuts Bashas'

17  bald assertion that commonality is lacking because the

18  plaintiffs cannot show that they "'have suffered the _same_

19  injury[.]'" Def.'s Supp. Br. (Doc. 301) at 9:14-15 (quoting

20  _Dukes_, 131 S.Ct. at 2551) (emphasis added by Bashas').  The

21  putative class members have suffered the same injury: they

22  received lower wages than their Caucasian counterparts at

23  A.J.'s and Bashas' stores at least "during the period 1998-

24  2000[]" when, it is undisputed, that "the pay scales at

25  Bashas' and A.J.'s stores were higher than those at Food

26  City[.]"  See _Parra II_, 536 F.3d at 977 ("according to

27  [Bashas'] pay scales, the hourly pay disparities for

28  comparable jobs at the three brand named stores ranged from

$0.15 per hour to $2.94 per hour[,]" which "translate to annual salary differences of around $300 per year to almost $6,000 per year[]"). Thus, unlike Dukes, this is not a "mere claim by [current and former Food City] employees that they have suffered a Title VII injury, or even a disparate-impact Title VII injury[.]" See Dukes, 131 S.Ct. at 2551. Rather, as is evident, plaintiffs' pay claims can "productively be litigated at once." See id.

In addition, Bashas' attacks on plaintiffs' statistical evidence are largely immaterial because they are directed primarily at Dr. Drogin's regression analyses, which plaintiffs offered to support their "Subjective Placement claim[]" – a claim they are no longer pursuing.[14] Pls.' Reply Br. (Doc. 303) at 7:1-2 (footnote omitted). Bashas' fares no better with its attacks on plaintiffs' anecdotal evidence – declarations from 13 former and current Bashas' employees. As with their statistical evidence, Bashas' contends that plaintiffs cannot establish commonality because, their anecdotal evidence, inter alia, does not "provide 'significant proof' that [Bashas'] operated under a general policy of discrimination[.]'" Def.'s Supp. Br. (Doc. 301) at 11:9-10 (quoting Dukes, 131 S.Ct. at 2553). Plaintiffs counter, and the court agrees, that their anecdotal evidence is "unnecessary to establish commonality[,]" Pls.' Reply (Doc. 303) at 7:15 (emphasis omitted), given the "three

---

[14] Given the simultaneous filing of the opening post-Dukes briefs, Bashas' cannot be faulted in its opening brief for concentrating on its perceived deficiencies in Dr. Drogin's analyses. Bashas' had no way of knowing when it filed that brief, that plaintiffs would be abandoning their Subjective Placement claim.

significant conclusions conceded by Bashas'" and identified above.  See Parra II, 536 F.3d at 979.

Of equal import is that Bashas' written, non-discretionary, centralized wage scale under which, as plaintiffs allege and the evidence indicates, Hispanic Food City hourly employees were paid less than their Caucasian counterparts at Bashas' and A.J.'s stores, is precisely what was missing in Dukes.   See Dukes, 131 S.Ct. at 2548 (emphasis added) ("These plaintiffs . . . do *not* allege that Wal-Mart has any express corporate policy against the advancement of women.")  Bashas' wage scales "provide the 'glue' the Supreme Court sought — but did not find — in *Dukes*, sufficient to 'say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." Ellis II, 285 F.R.D. at 530 (emphasis in original) (quoting Dukes, 131 S.Ct. at 2552).

So, for example, if a trier of fact finds that Bashas' wage scales "lead to disparate outcomes[,]" that "is a common question subject to classwide proof and rebuttal." See id. at 531.  In the parlance of Dukes, determining the "truth or falsity" of whether Bashas' wage scales violate Title VII or section 1981 in the manner alleged "will resolve in one stroke[]" an issue that is "central to the validity" of each class member's pay claim.  See Dukes, 131 S.Ct. at 2551; see also Evon v. Law Offices of Sidney Mickell, 688 F.3d 1015, 1029 (9th Cir. 2012) (quoting Dukes, 131 S.Ct. at 2551) (claim that defendant violated the Fair Debt Collection Practices

Act by sending "collection notices addressed to the debtor, but in 'care of' the debtor's employer, without first obtaining consent[,] . . . is a common contention among the class and 'determination of its truth or falsity' is pivotal to this lawsuit and is capable of determination 'in one stroke[]'"). "This case," at least insofar as the equal pay claim is concerned, "presents the classic case for treatment as a class action: that is, the commonality linking the class members is the dispositive question in the lawsuit." See Evon, 688 F.3d at 1030 (internal quotation marks and citation omitted).

Notably, "commonality only requires a *single* significant question of law or fact.'" Mazza, 666 F.3d at 589 (quoting Dukes, 131 S.Ct. at 2556) (emphasis added). Further easing a plaintiff's burden at this stage is that Rule 23(a)(2)'s commonality requirement is to be "construed permissively, and "[a]ll questions of fact and law need not be common to satisfy the rule." Ellis I, 657 F.3d at 981 (internal quotation marks and citation omitted); see also Evon, 688 F.3d at 1030 (internal quotation marks and citation omitted) ("It is not necessary that members of the proposed class share every fact in common.") Plaintiffs thus have a "limited burden under Rule 23(a)(2)[.]" Mazza, 666 F.3d at 589. Consequently, even in the wake of Dukes, for the reasons outlined above, this court has little difficulty finding that a class proceeding herein has "the capacity to generate common *answers* apt to drive the litigation" insofar as the equal pay claim is concerned. See Dukes, 131 S.Ct. at 2551

1   (internal quotation marks and citation omitted) (emphasis in

2   original); see also Gales v. Winco Foods, 2011 WL 3794887, at

3   *2 (N.D.Cal. Aug. 26, 2011)(finding commonality where

4   plaintiff identified an employer's policy of exempting from

5   overtime all assistant managers).  No individualized inquiry

6   is necessary to determine whether Bashas' wage scales violate

7   federal law.

8       While not alone dispositive, the difference in scale

9   between Dukes further underscores why Dukes does not preclude

10  a finding of commonality here.  Dukes was "one of the most

11  expansive class actions ever[,]" comprised of approximately

12  1.5 million members.  Dukes, 131 S.Ct. at 2547.  Moreover,

13  the Dukes plaintiffs "held a multitude of different jobs, at

14  different levels of Wal-Mart's hierarchy, for variable

15  lengths of time, in 3,400 stores, sprinkled across 50 states,

16  with a kaleidoscope of supervisors (male and female), subject

17  to a variety of regional policies that all differed."  Id.

18  (internal quotation marks and citation omitted).

19  Additionally, the plaintiffs in Dukes were challenging

20  "literally millions of employment decisions."  Id. at 2552,

21  2556 n. 9.  Given this factual scenario, the court agrees

22  with Judge Sand's astute observation in Chen-Oster v.

23  Goldman, Sachs & Co., 2012 WL 2912741 (S.D.Cal. July 17,

24  2012):

25          The Supreme Court suggested (when
            not explicitly stating) that the sheer
26          size of the class and the vast number
            and diffusion of challenged employment
27          decisions was key to the commonality
            decision. This makes a great deal of sense
28          when the purpose of the commonality enquiry
            is to identify 'some glue holding the

1

2

alleged reasons for all of [the
challenged] employment decisions together.'

3   Id. at *3 (quoting Dukes, 131 S.Ct. at 2552 (emphasis

4   omitted)).

5       The present case is vastly different.  There are not

6   millions of potential plaintiffs here.  Nor are the

7   plaintiffs scattered across the nation; they all work or

8   worked at Arizona Food City stores. And, they are not

9   challenging "millions of employment decisions;" rather, at

10  this point, they are only challenging Bashas' decision to pay

11  its employees pursuant to its two-tiered wage scales.  These

12  factual distinctions reinforce this court's conclusion that

13  plaintiffs have met their burden of showing commonality as to

14  the equal pay claim.

15          ***3.  Typicality***[15]

16      Next, plaintiffs must show that "the claims or defenses

17  of the representative parties [are] typical of the claims or

18  defenses of the class."  Fed. R. Civ. P. 23(a)(3). Bashas'

19  argues that the claims of named plaintiffs Estrada and

20  Martinez are not typical of those of the putative class

21  because there is no evidence of a shared "common

22  experience[.]" Bashas' Response to Motion for  Class

23

24      [15]   In Parra I, this court addressed typicality, but only with
    respect to the working conditions claim.  Indeed, after finding a lack of
25  commonality as to the equal pay claim,  the court explicitly noted that it
    had "not reached the other requirements for class certification on this
26  [equal pay] issue, and express[ed] *no opinion* on whether Plaintiffs could
    satisfy" the requirements of typicality and adequacy as to that claim.
27  Parra I, 2005 WL 6182338, at *16, n. 30 (emphasis added).  Moreover, given
    the Ninth Circuit's remand, as earlier noted, "for consideration of the
28  remaining class certification factors[,]" undeniably the issue of whether,
    *inter alia*, plaintiffs have shown typicality as to their pay claim is
    properly before the court now.

1   Certification ("Def.'s Resp. MCC") (Doc. 190) at 45:9.   As

2   to plaintiff Martinez alone, Bashas' argues that because she

3   works as a Food City Tortilla Ria Clerk, and that position

4   has "no comparable position in Bashas' or A.J.'s stores[,]"[16]

5   her pay claim is "unique to her," and thus not typical for

6   Rule 23(a)(3) purposes.   <u>Id.</u> at 59:21 (footnote omitted); and

7   61:12.  Bashas' also argues that because plaintiff Martinez

8   did not exhaust her administrative remedies, that is a

9   defense unique to her, thus precluding a finding that she is

10  a typical class representative.[17]   The court will address the

11  arguments pertaining solely to plaintiff Martinez first.

12  ### *a.  Aurelia Martinez*

13

---

14   [16]   Some preliminary clarification is necessary.  Bashas', like the
plaintiffs, declares that plaintiff Martinez has worked in "*one* position,
15  tortilleria [sic] clerk, since 1991."  Def.'s Resp. MCC (Doc. 190) at
59:18-21 (emphasis in original) (citation omitted); Plaintiffs' Motion for
16  Class Certification ("Pls.' MCC") (Doc. 159) at 14:23, ¶ 12 (citation
omitted) ("Aurelia Martinez has been employed as a tortilleria [sic] clerk
17  at a Food City store in Phoenix since July 1991.")  The record belies this
statement, revealing that Ms. Martinez worked both as a Tortilla Ria Clerk
18  and as Tortilla Machine Operator.   This is noteworthy because a basic
tenet of Bashas' argument that plaintiff Martinez's pay claim is atypical
19  is that she works, and has always worked, as a Tortilla Ria Clerk.
    From Bashas' Payroll Status Authorization form, it appears, however,
20  that in roughly mid-September 2001 Ms. Martinez was promoted to a Tortilla
Machine Operator.  Martinez Decl'n (Doc. 163), exh. A thereto.  Regardless
21  of the exact date of Ms. Martinez's promotion, a Bashas' Performance
Evaluation form shows that she held that position at least from January,
22  2001 to January, 2002.   <u>Id.</u>, exh. B thereto.   So although there is
uncertainty on this record as to exactly when Ms. Martinez first became
23  employed as a Tortilla Ria Clerk, and when she became a Tortilla Machine
Operator, clearly she held both positions at different times during the
24  class period.  However, because the parties' are focusing exclusively upon
Ms. Martinez's status as a Tortilla Ria Clerk, so, too, will the court.

25   [17]   Like commonality, typicality "tend[s] to merge with the adequacy-
26  of-representation requirement[.]" <u>Dukes</u>, 131 S.Ct. at 2551 n. 5.   So
although Bashas' presents these arguments when discussing adequacy, the
27  court will address them now – in the context of typicality.  Cf. <u>Ellis I</u>,
657 F.3d at 974 (citation omitted) (vacating "ruling as to 'typicality'
28  . . . because the district court failed to consider the effect that
defenses unique to the named Plaintiffs' claims have on that questions[]").

- 32 -

1       An integral part of Bashas' exhaustion argument is that

2   because Ms. Martinez's pay claim is unique, plaintiff

3   Estrada's Equal Employment Opportunity Commission ("EEOC")

4   charge, among others, did not provide Bashas' with adequate

5   notice of her pay claim.  So before considering Bashas'

6   exhaustion argument *per se*, the court first must decide

7   whether plaintiff Martinez's pay claim is unique.

8                    ***i.  "Tortilla Ria Clerk"***[18]

9       Bashas' argues that plaintiff Martinez's pay claim is

10  "unique to her[]" because she works as a Food City Tortilla

11  Ria Clerk, and that position has "no comparable position in

12  Bashas' or A.J.'s stores."[19]  Def.'s Resp. MCC (Doc. 190) at

13  61:12; and  59:21 (footnote omitted).  Disagreeing,

14  plaintiffs assert that a Tortilla Ria Clerk is the

15

16

17       [18]    This designation is taken directly from Bashas' wage scales.
    See, e.g.,  Def.'s exh. 1 (Proulx Aff.), exh. G thereto at BA 04350.

18

19       [19]    Some preliminary clarification is necessary.  Bashas', like the
    plaintiffs, declares that plaintiff Martinez has worked in "*one* position,
20  tortilleria [sic] clerk, since 1991."  Def.'s Resp. MCC (Doc. 190) at
    59:18-21 (emphasis in original) (citation omitted); Pls.' MCC (Doc. 159) at
21  14:23,  ¶ 12 (citation omitted) ("Aurelia Martinez has been employed as a
    tortilleria [sic] clerk at a Food City store in Phoenix since July 1991.")
22  The record belies this statement, revealing that Ms. Martinez worked both
    as a Tortilla Ria Clerk and as Tortilla Machine Operator.   This is
23  noteworthy   because a basic tenet of Bashas' argument that plaintiff
    Martinez's pay claim is atypical is that she works, and has always worked,
    as a Tortilla Ria Clerk.
24       From Bashas' Payroll Status Authorization form, it appears, however,
    that in roughly mid-September 2001 Ms. Martinez was promoted to a Tortilla
25  Machine Operator.  Martinez Decl'n (Doc. 163), exh. A thereto.  Regardless
    of the exact date of Ms. Martinez's promotion, a Bashas' Performance
26  Evaluation form shows that she held that position at least from January,
    2001 to January, 2002.   Id., exh. B thereto.   So although there is
27  uncertainty on this record as to exactly when Ms. Martinez first became
    employed as a Tortilla Ria Clerk, and when she became a Tortilla Machine
28  Operator, clearly she held both positions at different times during the
    class period.  However, because the parties' are focusing exclusively upon
    Ms. Martinez's status as a Tortilla Ria Clerk, so, too, will the court.

"equivalent" of a Donut Fryer,[20] and thus, plaintiff
Martinez's pay claim is typical of the putative class
members.  Pls.' Reply (Doc. 207) at 27:9 (citation omitted).

    In resolving this dispute, the court is fully aware of
its earlier comment that "[w]ithout further information[]" it
could not "determine whether Martinez's position [as a
Tortilla Ria Clerk] has a comparable counterpart in
Defendant's other stores."  Parra I, 2005 WL 6182338, at *18.
The court immediately noted, however, that "[r]egardless,
Martinez claims she has suffered from the same alleged
disparate working conditions as the proposed class members."
Id. (emphasis added).  So "[w]hile close," this court found
that Ms. Martinez sufficiently satisfie[d] the typicality
requirement of Rule 23(a)(3) on that issue[,]" i.e. the
working conditions claim.  Id. (emphasis added).

    In Parra I, this court was able to decide the typicality
issue as to Ms. Martinez's working conditions claim without
resolving whether a Food City Tortilla Ria Clerk has a
"comparable counterpart" in A.J.'s or Bashas' stores.
Therefore, the court's earlier quoted comment is, at most,
non-authoritative dictum, allowing it to visit that issue
against the backdrop of plaintiff Martinez's pay claim.

    Probing more deeply into the record, as part of its

---

[20]   More recently, plaintiffs took the position that Martinez's
"position as a tortilla clerk is equivalent to a higher paid position,
donut fryer, in the Bashas' stores."  Pls.' Supp. Br. (Doc. 302) at 20:3-4
(emphasis added) (citations and footnote omitted).  Plaintiffs' cites do
not support that proposition, however.  Moreover, as Bashas' pay scales,
among other things, reveal, and as plaintiffs argue above, Bashas' places
Tortillaria Clerks and Donut Fryers in the same wage bracket, undermining
this assertion that Donut Fryers are in a "higher paid position."

obligation to rigorously analyze whether the prerequisites of
Rule 23(a) have been met, convinces this court that plaintiff
Martinez's pay claim is typical of those of the putative
class.  Most significantly, Bashas' own pay scales do not
differentiate between "Tortilla Ria Clerk[s] & Donut
Fryer[s]" [.]" See, e.g., Larkin Decl'n (Doc. 161), exh. 13
thereto at BA 00196; exh. 14 thereto at BA 00206.  Even if
the duties differ, Bashas' repeatedly classifies a Tortilla
Ria Clerk and a Donut Fryer together in one, single category
for wage purposes. See Bashas' exh. 1 (Proulx Aff.), exh. G
thereto at BA 04350; exh. H thereto at BA 04340; exh. I
thereto at BA 04321; exh. J thereto at BA 04283; exh. K
thereto at 2; exh. L thereto at BA 04256 - 04258; exh. M
thereto at BA 08281 - 0828_;[21] BA 08293; BA 08295.  This joint
designation is not a one-time aberration. The joint
designation for "Tortillaria Clerk, [and] Donut Fryer" is
found elsewhere, on "Bashas' Wage and Employee Benefit
Program[.]"  Larkin Supp. Decl'n (Doc. 196), exh. 10 thereto
at BA 04231.

Tortillaria Clerk and Donut Fryer are not the only joint
designations for wage purposes.  Bashas' also jointly places
a "Lead Deli Clerk[]" and a "Cappuccino Manager" – two
positions which on the face of it seem to have little in
common - into one wage category.  See id., exh. 10 thereto at
BA 04231.  Thus, there are certain job positions which, for
whatever reasons, Bashas' deems so closely analogous to
warrant placing them in the same wage category.

Had Bashas' wanted to distinguish between Tortillaria

---

[21] The Bates stamp number is obstructed on the copy provided to the court.

Clerks and Donut Fryers, it could have, as it did for
Tortilla Production Supervisors and Tortilla Machine
Operators.  Those are separate job listings, with separate
wages; and, for the most part, employees in those positions
are paid more than employees in the Tortilla Ria Clerk and
Donut Fryer category.  See e.g., exh. 10 thereto at BA 04234.
The fact remains, however, that Bashas' did not make any
distinction in terms of wages with respect to those two
positions.

For these reasons, based upon the record as presently
constituted, to the extent Ms. Martinez is premising her
equal pay claim upon her tenure as a Food City Tortilla Ria
Clerk, her pay claim is typical of the pay claims of the
putative class.  In reaching this conclusion the court has,
as it must, focused on the *nature of the claim* or defense of
the class representative, *and not to the specific facts* from
which it arose or the relief sought." See Ellis I, 657 F.3d
at 984 (internal citation and quotation marks omitted)
(emphasis added).  That is because "[d]iffering factual
scenarios resulting in a claim of the same nature as other
class members does not defeat typicality." Id. at 985, n. 9
(citation omitted). Having found that plaintiff Martinez's
pay claim is typical of those of the class, the next issue is
whether, as Bashas' argues, her failure to exhaust her

1   administrative remedies is a unique defense which would

2   defeat typicality.

3                    ***ii. Exhaustion of Administrative Remedies***

4        A plaintiff must file a timely charge of discrimination

5   with the EEOC as a prerequisite to bringing a Title VII

6   action.  42 U.S.C. § 2000e-5(e).  There is no dispute that

7   Plaintiff Estrada filed such a charge and exhausted his

8   administrative remedies, see Bashas' exh. 40, and that

9   plaintiff Martinez did not.  Bashas' argues that plaintiff

10  Martinez's failure to exhaust her administrative remedies is

11  a "defense unique" to her, which bars her from serving as a

12  class representative as to any Title VII claims. Def.'s Resp.

13  MCC (Doc. 190) at 58:21, n. 39.[22]

14       Accurately reciting that notice is the underlying purpose

15  of  Title VII's exhaustion requirement, see B.K.B. v. Maui

16  Police Dep't, 276 F.3d 1091, 1099 (9th Cir. 2002), plaintiffs

17  invoke the "single filing" or "piggyback" rule.  Under that

18  exception to exhaustion, "an individual who has not filed an

19  administrative charge can 'piggyback' on an EEOC complaint

20  filed by another person who is similarly situated."[23]

21  _____

22       [22]    Section 1981 does not contain a similar exhaustion requirement.
    Therefore, Bashas' failure to exhaust argument is limited to plaintiffs'
23  Title VII claims.

24       [23]    In Parra I, when discussing typicality as to the working
    conditions claim, this court mentioned in passing that although Ms.
25  Martinez had not exhausted her administrative remedies, she "may
    'piggyback' onto Estrada's efforts and go forth with her Title VII claim."
26  Parra I, 2005 WL 6182338, at *17 (citing Albemarle Paper Co. v. Moody, 422
    U.S. 405, 414 n. 8, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)).  On its face,
27  that quote might appear to be dispositive of the exhaustion argument
    herein.  However, it is not.
28       There are two reasons for addressing the exhaustion argument anew at
    this juncture.  First, in Parra I, this court expressly declined to reach the
    issue of typicality as to the equal pay claim.  See n. 15 supra. Second,
    although this court is not alone in citing footnote 8 in Albemarle for the

                                    - 37 -

1    E.E.O.C. v. Giumarra Vineyards Corp., 2010 WL 3220387, at *4

2    (E.D.Cal. Aug. 13, 2010) (footnote and citation omitted).

3    Plaintiffs contend that Ms. Martinez is similarly situated to

4    "[s]everal [unspecified] members of the proposed class [who]

5    filed EEOC charges against [Bashas'] all alleging class

6    discrimination."  Pls.' Reply (Doc. 207) at 25:7-9.

7    Plaintiffs thus reason that as a result of those EEOC

8    charges, Bashas' had "notice of the 'substantive claims being

9    brought against [it] [and] of the number and generic

10   identities of the potential plaintiffs who may participate in

11   the judgment.'"  Id. at 25:9-12 (quoting American Pipe &

12   Construction Co. v. Utah, 414 U.S. 538, 555, 94 S.Ct. 756, 38

13   L.Ed.2d 713 (1974)).  Given that purported notice, plaintiffs

14   argue that Ms. Martinez's failure to exhaust her

15   administrative remedies is not a defense unique to her.

16   Named plaintiff Martinez thus meets Rule 23(a)(3)'s

17   typicality requirement irrespective of her failure to exhaust

18   her administrative remedies, plaintiffs reason.

19       Bashas' retorts that the other EEOC charges did not

20   provide the requisite notice because those charges "were not

21   detailed, did not give [it] notice of the claims of the other

22

23   proposition that unnamed class members need not file charges for Title VII

24   suits to proceed, see, e.g., Dukes v. Wal-Mart Stores, Inc., 2002 WL
     32769185, at *7 n. 4 (N.D.Cal. Sept. 9, 2002) ("Wal-Mart Stores"), a close

25   reading of Albemarle reveals that it does not speak directly to the issue
     squarely before the court now: whether a named plaintiff who has not

26   exhausted her administrative remedies can, nonetheless, be an adequate
     representative under Rule 23(a)(4).  Rather, footnote 8 answers in the

27   affirmative the issue of whether "backpay may be awarded on a class basis
     even without exhaustion of administrative procedures by the unnamed class

28   members."  See Albemarle, 422 U.S. at 414 n. 8, 95 S.Ct. 2362 (emphasis
     added).

1  class members, and in particular, could not have possibly

2  given [it] notice of Martinez' claims, because of their

3  uniqueness."  Def.'s Resp. MCC (Doc. 190) at 58, n. 39:26-27

4  (citation omitted).  Bashas' argument lacks both legal and

5  factual support.

6      In arguing that exhaustion of administrative remedies is

7  an essential predicate to serving as a class representative,

8  Bashas' relies upon this single sentence from Inda v. United

9  Air Lines, Inc., 565 F.2d 554 (9th Cir. 1977):

10              "[I]f one brings suits on his own behalf,
               or as a named plaintiff on behalf of a
11             class, he must have secured a right to sue
               by timely following the procedures set
12             forth in Title VII."

13  Id. at 559.  Plaintiffs counter that Gibson v. Local 40,

14  Supercargoes & Checkers, 543 F.2d 1259 (9th Cir. 1976),

15  "foreclose[s]" Bashas' Inda based argument.  Pls.' Reply MCC

16  (Doc. 207) at 24:9.  In Gibson, noting that only one

17  plaintiff had filed an EEOC charge, the Ninth Circuit

18  observed, "[t]his does not preclude representation of the

19  class by the other named plaintiffs or relief for the class."

20  Gibson, 543 F.2d at 1266 n. 13 (emphasis added) (citing

21  Franks v. Bowman Transp. Co., 424 U.S. 747, 771, 96 S.Ct.

22  1251, 1267, 47 L.Ed.2d 444 (1976); Albemarle, 422 U.S. at 414

23  n.8, 95 S.Ct. 2362)).

24      As plaintiffs strongly imply, Inda does not govern here,

25  but, then again, neither does Gibson.  Plaintiffs fault

26  Bashas' for relying upon Inda, which it characterizes as

27  "dictum[,]" and because since 1977, when Inda was decided,

28  "[n]o Ninth Circuit case . . . has read Inda to impose . . .

- 39 -

a requirement[]" that each named plaintiff must exhaust their administrative remedies to serve as a class representative. See Pls.' Reply (Doc. 207) at 24:24-25.  Somewhat ironically, plaintiffs' reliance upon Gibson is misplaced for nearly identical reasons.  The portion of Gibson upon which plaintiffs are relying also is dictum.  And, in the 37 years since Gibson, it has never been read to support the view that a named plaintiff need not exhaust their administrative remedies.[24]  Thus, there is no credence to plaintiffs' argument that Gibson "forecloses" Bashas'.

Bashas' reliance upon Inda is equally unavailing.  In the past 36 years, the Ninth Circuit has never invoked Inda to require each named plaintiff to individually exhaust their administrative remedies.  More importantly,"to the extent [the] language [quoted above] in Inda is not dicta, it has been restricted to its facts where a plaintiff sought to rely on an administrative charge of an individual employee in a separate action, and where the EEOC charge did not give sufficient notice that other similarly-situated persons would also be affected."  E.E.O.C. v. Cal. Psychiatric Transitions, Inc., 644 F.Supp.2d 1249, 1265 n. 11 (E.D.Cal. 2009)

[24]   This is not surprising given the Gibson Court's reference to Franks and Albemarle.  Those two Supreme Court cases considered whether unnamed plaintiffs can recover under Title VII; both found that they could. Albemarle, 422 U.S. at 414 n. 8, 95 S.Ct. 2362 ("reject[ing] th[]e contention[] . . . that no backpay can be awarded to those unnamed parties in the plaintiff class who have not themselves filed charges with the EEOC[]"); Franks, 424 U.S. 771, 96 S.Ct. 1251 (unnamed class members who had been discriminated against by their employer, but who had not filed administrative charges with the EEOC, were not precluded from relief in the form of retroactive seniority).  Neither of those decisions supports the view expressed in Gibson, however, and upon which plaintiffs so heavily rely, that an unnamed plaintiff, who has not filed an EEOC charge, may serve as class representative.

1   (citations omitted).  More recently, citing to those two

2   district court decisions, the Ninth Circuit left no doubt

3   that "*Inda* should be limited to its specific facts – where a

4   plaintiff sought to rely on an administrative charge . . . of

5   an individual employee in a separate action."  Harris v.

6   County of Orange, 682 F.3d 1126, 1136–1137 (9th Cir. 2012)

7   (citations omitted).  That express limitation on Inda

8   eviscerates Bashas' argument, premised solely on Inda, that

9   Ms. Martinez is not an adequate class representative because

10   she did not exhaust her administrative remedies under Title

11   VII.

12      The Ninth Circuit's Harris decision has relevancy here

13   beyond rejecting Inda's restrictive interpretation of the

14   single filing rule.  The Harris plaintiffs filed a class

15   action on behalf of thousands of Retirees alleging that the

16   "County's restructuring of its retiree medical program[,]"

17   violated, *inter alia*, their constitutional rights and the

18   Fair Employment and Housing Act ("FEHA").  Harris, 682 F.3d

19   at 1130.  One of the class representatives had timely filed

20   an administrative charge, but it "did not state that it was

21   'on behalf of' other class members."  Id. at 1131.

22   Therefore, the district court found that the Retirees did not

23   exhaust their administrative remedies under the FEHA.[25]  On

24   appeal, "[t]he Retirees argue[d] that the single filing rule

25   permit[ted] them to 'piggyback' on the timely filed

26   administrative complaint . . . of one of the named

27

28        [25]  Given the absence of relevant authority regarding the applicability of the single filing rule in FEHA actions, the court looked to Title VII cases, among others.  Harris, 682 F.3d at 1136.

plaintiffs." <u>Id.</u> at 1135.

Agreeing, the Ninth Circuit reiterated that the "single filing rule is based on the observation that it would be duplicative and wasteful for complainants with similar grievances to have to file identical notices of intent to sue with a governmental agency." <u>Id.</u> at 1136 (citing <u>Bean v. Crocker Nat'l Bank</u>, 600 F.2d 754, 760 n. 15 (9th Cir. 1979)); <u>see also</u> <u>Thiessen v. Gen. Elec. Capital Corp.</u>, 267 F.3d 1095, 1110 (10th Cir. 2001) ("The policy behind the single filing rule is that it would be wasteful, if not vain, for numerous employees, all with the same grievance, to have to process many identical complaints with the EEOC.") Consequently, even though the <u>Harris</u> administrative complaint did not indicate that it was a "class action" or "'on behalf of others similarly situated[,]'" nonetheless, the Court found it was "sufficient to establish exhaustion of administrative remedies for all class members." <u>Id.</u> at 1136 and 1137 (footnote omitted).  That is because the other named plaintiffs, who had not filed administrative complaints were "part of the same action asserted by" the plaintiff who had timely filed such a complaint. <u>Id.</u> at 1137.

Here, as fully discussed herein, Ms. Martinez is "part of the same action asserted" by Mr. Estrada who did timely file an EEOC charge.  Furthermore, in sharp contrast to the defendant employer in <u>Harris</u>, Bashas' had explicit, unequivocal notice of the existence of other similarly situated class members, such as Ms. Martinez.  Bashas' had such notice because Mr. Estrada  unambiguously declared that

he was "bring[ing] this charge on behalf of [him]self and
similarly situated Hispanic employees who [sic] [he]
believe[s] receive less pay and poorer assignments than
American-born, white employees."  Def.'s Resp. MCC (Doc.
190), exh. 40 thereto.  Not only that, arguably Bashas' had
additional notice because "[a]t least eight class charges of
race and national discrimination have been filed against [it]
by current proposed plaintiffs and class member witnesses in
this action."  Pls.' Reply to Def.s' Resp. to Mot. for Leave
to File First Amended Complaint (Doc. 103) at 5:10-12.  Thus,
if, as in Harris, the single filing rule can be applied
although the administrative complaint was silent as to
whether it was a class action or was being brought on behalf
of others similarly situated, surely Ms. Martinez can rely
upon that rule given that Mr. Estrada's EEOC charge was
unequivocal and explicit on that point.

Wal-Mart Stores, further bolsters a finding that Ms.
Martinez may "piggy-back" onto the EEOC charge of  Mr.
Estrada and others to establish exhaustion of her
administrative remedies.  There, the plaintiffs sought leave
to amend to add two plaintiffs who had never filed EEOC
charges.  The moving plaintiffs were relying upon the EEOC
charge of a named representative who had "filed charges on
her own behalf as well as for others similarly situated."
Wal-Mart Stores, 2002 WL 32769185, at *5.  Previously,
however, that named plaintiff was dismissed for failure to
meet Title VII's venue requirements and she became a putative
class member.  Among other reasons, including the Supreme

Court's recognition that "EEOC charge-filing requirements are
. . . equitable in nature," and because "notice was afforded
to Wal-Mart in accordance with the policy goals of Title
VII," the Wal-Mart Stores court found "that all named
plaintiffs in a Title VII class action need *not* individually
exhaust EEOC charge-filing requirements prior to joining a
class action." Id. at *7 (emphasis added).  The court
further reasoned that "the policy underpinnings of Title VII
and the single filing rule set forth in *Albermarle* – notice
to the defendant – is fully satisfied where at least one
plaintiff has filed a charge of discrimination alleging broad
class claims; and (2) requiring additional identical filing
serves no purpose other than to ensure duplicative
administrative proceedings." Id. (citation and footnote
omitted).  The court thus held that "a proposed named
plaintiff may rely on the administrative compliance of
otherwise compliant fellow named representatives." Id.

As can be seen, "the analytical touchstone of the single
filing rule is whether the company had adequate notice of the
grievance to provide a basis for conciliation." Giumarra
Vineyards, 2010 WL 3220387, at *8.  "A charge will be
adequate to support piggybacking under the single filing rule
if it contains sufficient information to notify prospective
defendants of their potential liability and permit the EEOC
to attempt informal conciliation of the claims before a
lawsuit is filed." Cal. Psychiatric Transitions, 644
F.Supp.2d at 1265 (citation omitted).  However,"[t]he
parties' claims need not be factually identical to those

1    timely filed, but instead need to be [of] sufficient

2    similarity as to prevent frustration of Title VII policies."

3    Id. at 1266 (citation omitted).  The single filing rule thus

4    intends to "give effect to the remedial purposes of [Title

5    VII] and to not exclude other suitable plaintiffs from [a

6    Title VII] class action simply because they have not

7    performed the useless act of filing a charge."  Giumarra

8    Vineyards, 2010 WL 3220387, at *4 (internal quotation marks

9    and citation omitted).

10        "[L]ook[ing] to the predicate or 'actually filed' EEOC

11   charge[]" of Mr. Estrada, id. (footnote and citations

12   omitted), it is apparent that that charge gave Bashas' the

13   requisite notice.  After identifying himself as "Hispanic[,]"

14   Mr. Estrada's charge informed Bashas', *inter alia*, of the

15   nature of his pay claim:

16               While employed by Bashas', Inc. I
                 believe that I have been discriminated
17               against based upon my national origin and
                 race with respect to pay[.]
18
                 Although the job I perform at Food
19               City is substantially the same job
                 as the work performed by my counterparts
20               at Bashas', I am paid less on an hourly
                 basis than the similarly situated employees
21               at Bashas'.  It is my belief and understanding
                 that most of the employees at Bashas' are
22               American born and Caucasian.  I believe I
                 am paid less because of my national origin,
23               Mexican, and my race, Hispanic.

24        Def.'s Resp. MCC (Doc. 190), exh. 40.  Further, Mr.

25   Estrada explicitly states that he was bringing his EEOC

26   charge "on behalf of [him]self and similarly situated

27   Hispanic employees who[m] [he] believe[s] receive less pay

28   and poorer assignments than American-born, white employees."

*Id.*

Similarly, the FAC alleges that Ms. Martinez, like Mr. Estrada, is a Hispanic hourly Food City employee, who was paid less than her Caucasian counterparts at Bashas' and A.J.'s.  FAC (Doc. 116) at 3, ¶ 8.   In light of the foregoing, Bashas' argument that it lacked notice of Ms. Martinez's pay claim is wholly unavailing. Further, for substantially the same reasons outlined in section A(3)(a)(i) above, Ms. Martinez's pay claim is not so unique from those of Mr. Estrada so that it can be said that Bashas' lacked notice of her pay claim on that basis.  Hence, the asserted "uniqueness" of Ms. Martinez's pay claim does not vitiate that notice.

Taking another but equally unpersuasive tack, Bashas' contends that "[i]f Estrada (the only other named Plaintiff now suing on behalf of the class) is dismissed from the case or deemed inappropriate as class representative, Martinez could not take his place." Def.'s Resp. MCC (Doc. 190) at 57:19-21 (citation omitted).  Plaintiffs respond that even if Mr. Estrada cannot serve as a class representative, that would not "negate notice."  Pls.' Reply (Doc. 207) at 25:21-22 (citation omitted).  Hence, there is no basis for barring Ms. Martinez from serving as class representative even if, ultimately, Mr. Estrada cannot.

Plaintiffs have the sounder argument.  In the first place, Bashas' primary authority, Robinson v. Sheriff of Cook County, 167 F.3d 1155 (7th Cir. 1999), as well as the two

1    cases to which it cites,[26] are out of Circuit non-binding

2    precedent. Second, all three cases are factually

3    distinguishable, further diminishing their precedential

4    value.[27]   In <u>Robinson</u>, also a Title VII action, the defendant

5    challenged Mr. Robinson's suitability as a class

6    representative relying upon evidence of "his very poor

7    employment record[.]" <u>Robinson</u>, 167 F.3d at 1156.   On that

8    basis, the district court rejected Robinson as the class

9    representative, but allowed another individual "to join the

10   suit as a plaintiff and take Robinson's place as class

11   representative." <u>Robinson</u>, 167 F.3d at 1158; and 1156.   When

12   it was later discovered that that second individual had not

13   filed an EEOC charge, the district court dismissed her claim

14   and "disqualified her from serving as Robinson's successor as

15   class representative. " <u>Id.</u> at 1156.   The district court

16   proceeded with the original named plaintiff's individual

17

18        [26]   <u>Wakeen v. Hoffman House, Inc.</u>, 724 F.2d 1238 (7th Cir. 1983); and
     <u>Griffin v. Dugger</u>, 823 F.2d 1476 (11th Cir. 1987).

19        [27]   <u>Wakeen</u> involved a very different situation than the present case.

20   In <u>Wakeen</u>, the Seventh Circuit held "that a class member who does not meet
     the procedural prerequisites for waging a Title VII suit may not use the
     guise of a motion to intervene to take over as the sole class

21   representative for someone who initiates but is not legitimately able to
     continue a class action." <u>Wakeen</u>, 724 F.2d at 1246.   In fact, in <u>Byas v.</u>

22   <u>Union Pacific R.R. Co.</u>, 2007 WL 1021976 (S.D.Ill. 2007), in a case not
     unlike the present one, the court held that "[t]he narrow holding of <u>Wakeen</u>

23   does <u>not</u> apply in the instant case, where there are three named plaintiffs,
     one of whom has satisfied EEOC filing requirements." <u>Id.</u> at *3 (emphasis

24   added).
          <u>Griffin</u> is likewise readily distinguishable from the present case.

25   There, the Eleventh Circuit held that an intervening plaintiff could not
     invoke the single filing rule because he was "not sufficiently similarly

26   situated[]" to the plaintiff who had timely filed an adequate EEOC
     complaint.   <u>Griffin</u>, 823 F.2d at 1493.   As discussed above, plaintiff

27   Martinez's pay claim is sufficiently similar to plaintiff Estrada's.
     Moreover, unlike in <u>Griffin</u>, plaintiff Martinez is not seeking

28   intervention.

1   claim, dismissing it after a bench trial.

2       On appeal, the plaintiffs argued, *inter alia*, that the

3   class should have been certified with both of them as "class

4   representatives irrespective of the deficiencies in their

5   claims[.]" Id. at 1157.  Affirming denial of the class

6   certification, the  Robinson Court found dispositive the fact

7   that because Robinson had been rejected as the class

8   representative, "there was no class action when [the second

9   individual] was added to the suit."  Id. at 1158.  Expanding

10  upon that reason, then Chief Judge Posner wrote:

11              There was no class representative who
                had dropped the baton for her to pick up;
12              Robinson had never been approved as
                the class representative. [The second
13              individual's] suitability as class
                representative had thus to be
14              determined independently of him.

15  Id.  Bashas' asserts that Ms. "Martinez would fail [such] an

16  independent evaluation of her suitability to be class

17  representative and should not be approved as one."  Def.'s

18  Resp. MCC (Doc. 190) at 58:11-12 (footnote omitted).

19      To support this assertion, Bashas' seizes upon the

20  following language from Robinson:

21              In effect the appeal asks us to graft
                [the original class representative's]
22              timely filing with the EEOC onto
                [the successor's] untimely but not-yet-
23              shown-to-be-unmeritorious discrimination
                case to create a composite plaintiff to
24              represent the class of blacks denied
                employment by the defendant. We cannot
25              find any basis in law or good sense for
                such ghastly surgery. Neither plaintiff
26              is a suitable class representative, and
                zero plus zero is zero.

27

28  Id. at 58:2-5 (quoting Robinson, 167 F.3d at 1157) (other

citations omitted).  Because <u>Robinson</u> is readily distinguishable, it does nothing to advance Bashas' argument, however.

     The above quote was made in the context of "a named plaintiff whose claims were *particularly* deficient-in fact, they had been dismissed-and who was attempting to represent a class of people with potentially plausible claims." <u>Norris-Wilson v. Delta-T Group, Inc.</u>, 270 F.R.D. 596, 605 (S.D.Cal. 2010) (emphasis in original).  That is not the situation here.  There has been no showing at this juncture that Ms. Martinez's pay  claim is "particularly deficient[.]" <u>See</u> <u>id.</u> What is more, <u>Robinson</u> supports the view that "[a] plaintiff should not be disqualified as a class representative simply because the "defendant *may* have good defenses" against that plaintiff." <u>Perez v. State Farm Mut. Auto. Ins. Co.</u>, 2011 WL 8601203, at *2 (N.D.Cal. Dec. 7, 2011) (quoting <u>Norris-Wilson</u>, 270 F.R.D. at 605 (quoting in turn <u>Robinson</u>, 167 F.3d at 1158) (emphasis in original).  Nor should a named plaintiff be "disqualified as class representative if [s]he *may* fail to prove h[er] case[.]" <u>Robinson</u>, 167 F.3d at 1158 (citation omitted) (emphasis in original).  As the <u>Robinson</u> Court made clear, "[o]nly if a plaintiff's 'claim is a *clear* loser at the time [she] asks to be made class representative' should she be disqualified, because in that case, approving her 'as class representative can only hurt the class.'" <u>Perez</u>, 2011 WL 8601203, at *2 (quoting <u>Robinson</u>, 167 F.3d at 1158) (emphasis in original)).  There has been no such showing here.

1    Thus, the primary purpose of filing an EEOC charge --

2   notice -- was afforded to Bashas', even though named

3   plaintiff Martinez did not herself file such a charge.  Mr.

4   Estrada's EEOC charge, and others, "contain[ed] sufficient

5   information to notify [Bashas'] of [its] potential liability

6   and permit the EEOC to attempt informal conciliation of the

7   claims before a lawsuit is filed."  See Cal. Psychiatric

8   Transitions, 644 F.Supp.2d at 1265 (citation omitted).

9   Therefore, because "the purposes behind the filing

10  requirement [we]re satisfied" in this case, "no injustice or

11  contravention of congressional intent occurs by allowing [Ms.

12  Martinez] [to] piggyback[]'" on Mr. Estrada's charge.  See

13  Giumarra Vineyards, 2010 WL 3220387, at *5 (quoting Thiessen,

14  267 F.3d at 1110).  In fact, because Mr. Estrada's EEOC

15  charge and others, see Def.'s Resp. MCC (Doc. 190), exh. 40

16  thereto, gave Bashas' notice of the pay claim against it, Ms.

17  Martinez was not required to perform the "useless act" of

18  filing her own separate charge.  Giumarra Vineyards, 2010 WL

19  3220387, at *4 ("An act of filing an EEOC charge is deemed

20  'useless' in situations in which the employer is already on

21  notice that Plaintiffs may file discrimination claims, thus

22  negating the need for additional filings.") (internal

23  quotation marks and citation omitted).  As discussed above,

24  plaintiff Martinez can avail herself of the single filing

25  rule and piggyback on the EEOC charges of other plaintiffs,

26  such as Mr. Estrada.[28]

27

28          [28]    This does not foreclose the possibility that if, at a later
   juncture, plaintiff Martinez's ability to represent the class is "found
   wanting, the court may seek a substitute representative or decertify the
   class."  See U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 416, 100 S.Ct.

1    Accordingly, because plaintiff Martinez's pay claim is
2    not subject to the defense of failure to exhaust her
3    administrative remedies, that defense "cannot be a reason for
4    finding that the typicality requirement is not satisfied."
5    See Evon, 688 F.3d at 1030 (because defendant did "not
6    qualify for the bona fide error defense as a matter of law,
7    . . . whether [plaintiff's] claim is subject to this
8    affirmative defense cannot be a reason for finding that the
9    typicality requirement is not satisfied[]").  For that same
10   reason, there is no "danger that absent class members will
11   suffer" because plaintiff Martinez "is preoccupied with [a]
12   defense[] unique to [her].'"  See Ellis I, 657 F.3d at 984
13   (quoting Hanon, 976 F.2d at 508 (other quotation marks and
14   citation omitted).  Finally, based upon the rulings herein,
15   there also is no danger that plaintiff Martinez's failure to
16   exhaust her administrative remedies will "create a
17   distraction that will become a 'major focus of the
18   litigation.'"  See Ellis II, 285 F.R.D. at 534.  In short,
19   neither plaintiff Martinez's pay claim nor her failure to
20   exhaust her administrative remedies are barriers to a finding
21   of typicality.  The issue still remains, though, as to
22   whether  plaintiffs Estrada and Martinez can meet Rule
23   23(a)(3)'s typicality standard given what Bashas' describes
24   as the lack of  evidence of a shared "common experience[.]"
25   See Def.'s Resp. MCC (Doc. 190) at 45:9.

26   . . .

27

28   1202, 63 L.Ed.2d 479 (1980) (citations omitted) ("If the named plaintiff's
     own claim becomes moot after certification, the court can re-examine his
     ability to represent the interest of the class members.")

1

### b.  Gonzalo Estrada and Aurliea Martinez

2      Typicality, like commonality, "serve[s] as [a]

3   guidepost[] for determining whether under the particular

4   circumstances maintenance of a class action is economical and

5   whether the named plaintiff's claim and the class claims are

6   so interrelated that the interests of the class members will

7   be fairly and adequately protected in their absence." Dukes,

8   131 S.Ct. at 2511, n. 5 (quoting Falcon, 457 U.S. at 157, n.

9   13, 102 S.Ct. 2364).  "The test of typicality is whether

10  other members have the same or similar injury, whether the

11  action is based on conduct which is not unique to the named

12  plaintiffs, and whether other class members have been injured

13  by the same course of conduct." Ellis I, 657 F.3d at 984

14  (internal citation and  quotation marks omitted).  Put

15  differently, under Rule 23(a)(3)'s "permissive standards,

16  representative claims are 'typical' if they are reasonably

17  co-extensive with those of absent class members; they need

18  not be substantially identical." Hanlon v. Chrysler Corp.,

19  150 F.3d 1011, 1026 (9th Cir. 1998).

20      That test for typicality is easily met here, despite

21  Bashas' contrary protestations.  Plaintiff Estrada is a

22  Hispanic former hourly Food City employee, and plaintiff

23  Martinez is a Hispanic  current Food City hourly employee.[29]

24

25      [29]    Ms. Martinez's declaration is from 2004.  Not having been advised
    to the contrary, the court presumes she is still a Food City employee.  At
26  the  same  time,  however,  the  court  is  well  aware  that   "[c]lass
    certification is not immutable, and class representative status could be
27  withdrawn or modified if at any time the representatives could no longer
    protect the interests of the class." Cummings v. Connell, 316 F.3d 886, 896
28  (9th Cir. 2003) (citation omitted); see also Lopez v. San Francisco Unified
    School District, 2003 WL 26114018, at *2 (N.D.Cal. Sept. 8, 2003) (citation
    omitted) ("[T]he Court has a duty throughout the litigation to stringently
    examine the adequacy of class representatives.")

1   Both allege that they were paid less than their Caucasian

2   counterparts at A.J.'s and Bashas' for performing the same

3   work.  See FAC (Doc. 116) at ¶ 8; and Def.'s Resp. MCC (Doc.

4   190), exh. 40 (Estrada EEOC charge) thereto. The putative

5   class, comprised of "all past, present and future Latino

6   employees of" defendant alleges that same, identical injury.

7   See FAC (Doc. 116) at 3:19-20, ¶ 10.   Further, as discussed

8   with respect to commonality, this lawsuit is "based on

9   conduct which is *not* unique to the named plaintiffs" –

10  Bashas' wage scales.  See Ellis I, 657 F.3d at 984 (internal

11  quotation marks and citation omitted).  Lastly, "other class

12  members have been injured by" those wage scales  because, as

13  Bashas' conceded, under its wage scales "Hispanic employee

14  hourly rates were lower in similar jobs[,]"[30] at least "during

15  the period 1998-2000[.]"  See Parra II, 536 F.3d at 979.

16  Thus, as just shown, Bashas' contention that the alleged

17  discrimination has not "'*manifested itself . . . in the same*

18  *general fashion*[]'" borders on the frivolous insofar as the

19  equal pay claim is concerned.  See Def.'s Resp. MCC (Doc.

20  190) at 45:9; and  45:26-27 (quoting Falcon, 457 U.S. at 159

21  n. 15, 102 S.Ct. 2364) (emphasis added by Bashas').

22      An additional basis for finding typicality in this action

23  is that the named plaintiffs' pay claims "rest on legal

24  theories that apply to all putative class members."  See Wood

25

26

27      [30]    As previously discussed, this is one of three concessions which
    the Ninth Circuit found highly pertinent with respect to commonality.
    However, because Rule 23(a)'s commonality and typicality requirements

28  "'tend to merge[,]'" Dukes, 131 S.Ct. at 2551 (quoting Falcon, 457 U.S. at
    157 n. 13, 102 S.Ct. 2364)), this concession also heavily bears on the
    typicality inquiry.

v. Betlach, 286 F.R.D. 444, 448 (D.Ariz. 2012) (citing Cohen
v. Chicago Title Ins. Co., 242 F.R.D. 295, 299 (E.D.Pa. 2007)
("[E]ven relatively pronounced factual differences will
generally not preclude a finding of typicality where there is
a strong similarity of legal theories.'") (citation omitted);
Mitchell-Tracey v. United Gen. Title Ins. Co., 237 F.R.D.
551, 558 (D.Md. 2006) ("'[W]hile claims of particular
individuals may vary in detail from one to another, the
collective claims focus on particular policies applicable to
each class member thereby satisfying the typicality
requirement of Rule 23(a).'") (other citation and footnote
omitted).  Because the named plaintiffs' pay claims rest on
the same legal theories, and because those claims are
reasonably co-extensive with the absent class members, they
have cleared the typicality hurdle.  See Gong-Chun v. Aetna
Inc., 2012 WL 2872788, at *8 (E.D.Cal. July 12, 2012)
(typicality shown where "Plaintiffs' claims are 'co-
extensive' with the other Class Members, as Plaintiffs and
the absent Class Members were all Defendants' employees who
were paid under the same pay practices and worked under the
same company-wide employment policies[]"); see also Marin v.
Evans, 2008 WL 2937424, at *4 (E.D. Wash. July 23, 2008)
(finding typicality where the "named Plaintiffs were
employees of [defendant company], and their claim is that
they were allegedly injured by the Illegal Hiring Scheme by
reduction in pay, which is typical of the claims that would
be asserted by all members of the purported class[]").

. . .

1

### 4.  Adequacy

2      The last Rule 23(a) hurdle plaintiffs must clear is

3 subsection four, which provides that "the representative

4 parties will fairly and adequately protect the interests of

5 the class."[31]  Fed.R.Civ.P. 23(a)(4).  This requirement

6 "satisf[ies] due process concerns[]" in that "absent class

7 members must be afforded adequate representation before entry

8 of a judgment which binds them."  Hanlon, 150 F.3d at 1020

9 (citing Hansberry v. Lee, 311 U.S. 32, 42-43, 61 S.Ct. 115,

10 85 L.Ed. 22 (1940)).  The adequacy-of-representation

11 requirement "also raises concerns about the competency of

12 class counsel and conflicts of interest."  See Dukes, 131

13 S.Ct. at 2551 n. 5 (citation and internal quotation marks

14 omitted).  Therefore,  "[a]dequate representation depends on,

15 among other factors, an absence of antagonism between

16 representatives and absentees, and a sharing of interest

17 between representatives and absentees."  Ellis I, 657 F.3d at

18 985  (citation omitted).  Consequently, "[t]o determine

19 whether named plaintiffs will adequately represent a class,

20 courts must resolve two questions: '(1) do the named

21 plaintiffs and their counsel have any conflicts of interest

22 with other class members and (2) will the named plaintiffs

23 and their counsel prosecute the action vigorously on behalf

24

_____

25      [31]     "Since the revision of Rule 23 in December 2003, the adequacy of
class counsel is now evaluated pursuant to Rule 23(g). 'Rule 23(a)(4) will
26 continue to call for scrutiny of the proposed class representative, while
this subdivision will guide the court in assessing proposed class counsel
27 as part of the class certification process.'" Parra I, 2005 WL 6182338, at
*18 n. 33 (quoting Fed.R.Civ.P. 23 Advisory Committee note).

28

of the class?'" <u>Id.</u> (quoting <u>Hanlon</u>,  150 F.3d at 1020).
Here, as explained below, the court answers the first
question in the negative, and the second, in the affirmative.
As a result, it finds that named plaintiffs Estrada and
Martinez are adequate class representatives with respect to
the pay claim.

     Plaintiffs Estrada and Martinez maintain that they are
adequate class representatives because they are "able and
willing to represent the class[,]" and they have the  "same"
interests as those of the potential class members in that
they are seeking to prove, *inter alia*, that Bashas' "pay
policies . . . discriminate against Hispanic[] workers."
Pls.' MCC (Doc. 159) at 22:10-13 (citations and footnote
omitted).  Essentially, Bashas' counters that the named
plaintiffs do not have the same interests as the putative
class because they are "puppets" of the United Food and
Commercial Workers Union ("the Union"), having "private
ulterior motives[.]"  Def.'s Resp. MCC (Doc. 190) at 48:1-21;
47:7 (emphasis omitted).

     This ulterior motives argument can be resolved with
dispatch because this court already addressed it in <u>Parra I</u>,
albeit in the context of the working conditions claim.  The
differing nature of the claim does not change the result
though.  The record is the same; the arguments are the same;
and the court's view is the same.  It is "not convinced that
the named plaintiffs are inadequate due to [Bashas'] 
allegations of ulterior motives."  <u>Parra I</u>, 2005 6182338, at
*18.  It is necessary, though, to address Bashas' remaining

challenges, not specifically addressed in Parra I, as to the

adequacy of named plaintiffs Estrada and Martinez to serve as

class representatives.

### a.  *Gonzalo Estrada*

#### i.  *"Individual Claim"*

Bashas' claims that plaintiff Estrada is not an adequate

class representative because he has "no individual claim fit

to pursue[.] Def.'s Resp. MCC (Doc. 190) at 56:6.  This

court's finding in Parra I that plaintiff Estrada

"articulated [a] claim for pay disparity" undercuts that

assertion.  See Parra I, 2005 WL 6182338, at *17.

There is likewise no merit to Bashas' claim that Mr.

Estrada is not an adequate class representative because  "he

is involved in this suit, not for what happened to him, but

for what happened to others."  Def.'s Resp. MCC (Doc. 190) at

54:10-11.  The basis for this assertion is the following

snippet from Mr. Estrada's deposition:

> Q.  And in this lawsuit you're not
> involved in it because of what
> happened to you?
>
> A.  No.
>
> Q.  You're standing up for other employees?
>
> A.  Yes.

Id. at 54:12-16 (citing exh. 11 thereto 54:4-8) (footnote

omitted).  If anything, it strikes the court that a

willingness to "stand[] up for other employees" is further

indicia that plaintiff Estrada is a proper class

representative.  See id.  This is especially so given that Mr.

Estrada, like Ms. Martinez, has declared his "ability and

1  willingness to represent the class."  See Parra I, 2005 WL

2  6182338, at *18 (citations omitted).  Taking the record as a

3  whole, the court finds unconvincing Bashas' argument that

4  plaintiff Estrada is not an adequate class representative

5  because he is not asserting an individual claim.

### *ii.  Former Employee*

7      Bashas' also endeavors to show that Mr. Estrada and the

8  potential class members do not have a shared interest because

9  he is a former Food City employee whose circumstances are

10  "vastly different" than those of the putative class.  Def.'s

11  Resp. MCC (Doc. 190) at 54:27, n. 38.  One such difference is

12  Mr. Estrada's lack of "interest in returning to Food City,"[32]

13  which Bashas' argues renders "moot . . . the issue of

14  injunctive relief[.]"  Id.  Disregarding the nature of the

15  relief sought, plaintiffs respond that "[f]ormer employees may

16  represent current employees in a class action[.]" Pls.' Reply

17  (Doc. 207) at 24:1 (citations omitted).

18      These arguments are imported directly from the 2004 class

19  certification motion.[33]  Both the law, and the plaintiffs'

20

21  [32]     To support this assertion, Bashas' is relying upon an excerpt
from Mr. Estrada's deposition.  See Def.'s Resp. MCC (Doc. 190) at 54:26

22  (citing "Estrada Depo p. 44 ll. 10-12").  There is no reason to doubt the
veracity of that statement.  At the same time though, there is no way to

23  ascertain its accuracy because the excerpts provided in connection with the
supplemental briefs did not include that page.  That is also the case for

24  the remaining excerpts from Mr. Estrada's deposition which Bashas' cites in
footnote 38 of its response to the motion for class certification.  Such

25  inadvertent omissions are always bothersome, but they were all the more so
here where the combined briefs and record are in the range of 3,000 pages.

26

27  [33]     Devoting its post-Dukes briefs exclusively to commonality and
typicality, Bashas' omitted any discussion of adequacy.  In their post-

28  Dukes supplemental brief, plaintiffs direct the court to their "original
briefing" as to adequacy, among other things.  See Pls.' Supp. Br. (Doc.
302) at 19:25-26. Therefore, because on remand this court must consider
whether each of the threshold Rule 23(a) requirements is met as to the

1  position along with it, have changed since that time however.

2  In 2004, plaintiffs were relying upon Rule 23(b)(2)[34] as the

3  basis for class certification of both the equal pay and

4  working conditions claims.  In fact, in <u>Parra I</u>, this court

5  certified a class under that Rule only as to working

6  conditions.  In the intervening years, in <u>Dukes</u> the Supreme

7  Court unanimously held  that "individualized monetary claims

8  belong in Rule 23(b)(3)"[35]  - not in Rule 23(b)(2).  <u>See</u>

9  <u>Dukes</u>, 131 S.Ct. at 2558.  Consequently, in light of <u>Dukes</u>,

10 now plaintiffs are seeking class certification of the equal

11 pay claim strictly on the basis of Rule 23(b)(3).

12     That shift takes the issue of injunctive relief

13 _____

14 equal pay claim, necessarily it has resorted to the parties' original, pre-

15 <u>Dukes</u>' arguments.

16    [34]   That Rule provides:

17         A class action may be maintained if Rule 23(a)
          is satisfied and if: . . .

18             the party opposing the class has acted

19             or refused to act on grounds that apply
              generally to the class, so that final
              injunctive relief or corresponding

20             declaratory relief is appropriate respecting
              the class as a whole[.]

21

22 Fed.R.Civ.P. 23(b)(2).

      [35]   In relevant part, that Rule reads as follows:

23

24         A class action may be maintained if
          Rule 23(a) is satisfied and if:

25             the court finds that the questions
              of law or fact common to class members

26             predominate over any questions
              affecting only individual members, and

27             that a class action is superior to
              other available methods for fairly

28             and efficiently adjudicating the controversy.

Fed.R.Civ.P. 23(b)(3).

completely out of the equation insofar as the pay claim is concerned.  Not only that, if ultimately plaintiffs were to prevail on their pay claim, Mr. Estrada, as well as other putative class members (current and former hourly Food City employees), would be entitled to recover monetary damages, despite the fact they are no longer employed there.  See Ansoumana v. Gristede's Operating Corp., 201 F.R.D. 81, 87 (S.D.N.Y. 2001) (in analyzing adequacy, finding that "[b]ecause this is a suit primarily for money damages stemming from past actions, it is not relevant that only one of the named Plaintiffs is still employed as a delivery person[]"). The Supreme Court in Dukes recognized as much, stressing that "if a backpay action were properly certified for class treatment under (b)(3), the ability to litigate a plaintiff's backpay claim as part of the class would not turn on the irrelevant question whether []he is still employed at [the defendant store]."  Dukes, 131 S.Ct. at 2560 (emphasis in original).  Thus, plaintiff Estrada's former employee status does not weaken a finding that he is an adequate class representative insofar as the plaintiffs are seeking monetary damages for their equal pay claim.[36]

The same is true with respect to Bashas' litany of the

---

[36]     By curtailing the relief which they are seeking as to their pay claim, plaintiffs have negated altogether Bashas' argument that as a former employee Mr. Estrada is an inadequate class representative because he lacks a shared interest with the class as to injunctive relief.  If plaintiffs were still seeking such relief, the result would be different, see Ellis I, 657 F.3d at 986 (vacating district court's finding that the former employees could adequately represent that class because they had "no incentive to pursue injunctive relief[,]" and hence they did not "share an interest with class members whose primary goal [wa]s to obtain injunctive relief[]" under Rule 23(b)(2)), but the fact remains that they are not. Plaintiffs' equal pay claim seeks only monetary damages.

1    other "vastly different circumstances" which allegedly are

2    indicative of a conflict of interest, such that Mr. Estrada

3    would not adequately represent the class.  See Def.'s Resp.

4    MCC (Doc. 190) at 54, n. 38.  Bashas' does not explain, and

5    the court fails to see how, Estrada's termination, his

6    supposed lack of interest in working at A.J.'s or Bashas', or,

7    in the grocery industry generally, and his doubling in pay,[37]

8    render him an inadequate class representative.  Moreover,

9    plaintiff Estrada is seeking the same relief as the putative

10   class – monetary damages.  His claimed injury also is the same

11   as the putative class  – as a Hispanic Food City hourly

12   employee, allegedly he received less pay than his Caucasian

13   counterparts at A.J.'s and Bashas'.  Consequently, not only is

14   there a "sharing of interest" between plaintiff Estrada and

15   the potential class members, but there is an "absence of

16   antagonism between" them.  See Ellis I, 657 F.3d at 985

17   (citation omitted).  Accordingly, plaintiff Estrada is an

18   adequate class representative pursuant to Rule 23(a)(4),

19   insofar as the pay claim is concerned.

20        . . .

21            **b.  _Aurelia Martinez_**

22        [37]    Observing that plaintiff Estrada's pay "nearly doubled," Bashas'
23   strongly implies that that factor militates against a finding that he is an
     adequate representative.  See Def.'s Resp. MCC (Doc. 190) at 54:24, n. 38
24   (citing "Estrada Depo p. 7 l.21 – p. 8 ll.14").  This is one of the
     deposition excerpts, mentioned earlier, which was not provided to the
25   court.  In this instance, however, based upon Mr. Estrada's declaration,
     the court was able to easily corroborate  that his pay did nearly double
26   during his tenure at Food City.  See Estrada Decl'n (Doc. 176) at 3:7-14,
     ¶ 8.  At the end of the day that is immaterial though if, as plaintiffs
27   allege, Mr. Estrada's Caucasian counterparts at Bashas' and A.J.'s were
     paid more for doing the same or similar work.  Therefore, this asserted
28   doubling of pay does not mean that Estrada would be an inadequate class
     representative.

- 61 -

Bashas' advances two other equally unpersuasive theories as to why Ms. Martinez in particular is not an adequate class representative.  The first is that allegedly her claims are weak, and the second is her credibility.

### i.  Strength of Claims

Bashas' disputes the legitimacy and sufficiency of Ms. Martinez's claims because in June 1999, when she and her husband filed for bankruptcy, she did not list her potential claims in this lawsuit as a contingent and unliquidated claim on their Schedule B form.  Ms. Martinez signed the declaration accompanying that Schedule under penalty of perjury.  See Def.'s Resp. MCC (Doc. 190) at 62:9-10.  Further, between October, 2002, when Ms. Martinez and her husband were discharged in bankruptcy, and the April 4, 2002, commencement of this action, Bashas' points out that Ms. Martinez did not amend Schedule B to include any potential claims herein.  These omissions, Bashas' contends, "suggest[] either that (1) [Ms. Martinez] has no legitimate claims, or (2) she knew that any potential claim had no value."  Id. at 61:15-16; 62:18-20.  The court declines to make either inferential leap, especially when there is no factual or legal basis for so doing.

Ms. Martinez did not become a named plaintiff until more than four and a half years after she and her husband filed for bankruptcy.  Therefore, the court agrees with plaintiffs that it is not surprising that Ms. Martinez did not mention this lawsuit during the bankruptcy.  Furthermore, during the six month overlap of the pendency of this action and the Martinez bankruptcy, Ms. Martinez's involvement in this action was peripheral.  She was simply a member of a proposed, but

1   *un*certified, class.   Until a decision on class certification,

2   including the scope of the class,  Ms. Martinez had no way of

3   knowing whether she would actually become a class member.   In

4   fact, the possibility of Ms. Martinez becoming a named

5   plaintiff did not occur until December 4, 2003, more than a

6   year after the bankruptcy discharge, upon the filing of a

7   motion to amend the complaint to include Ms. Martinez as a

8   named plaintiff.   And, it was not until March 11, 2004, that

9   the FAC, adding Ms. Martinez as a named plaintiff, actually

10   was filed. This particular factual situation does not give

11   this court any reason to doubt the adequacy of Ms. Martinez as

12   a class representative.

13      Continuing to question the strength of Ms. Martinez's

14   claims, because she did not disclose them during her

15   bankruptcy, Bashas' argues that such "[w]eakness or

16   illegitimacy in a proposed class representative's case is an

17   "'independent reason to doubt the adequacy of [her]

18   representation.'"   Def.'s Resp. MCC (Doc. 190) at 63:7-8

19   (quoting <u>Robinson</u>, 167 F.3d at 1157) (other citations

20   omitted).   This argument is unpersuasive.

21      In the first place, this court agrees that "[t]he

22   adequacy prong of Rule 23(a) isn't the place to try to

23   litigate the merits of a case." <u>Norris-Wilson</u>, 270 F.R.D. at

24   605-06.  "In fact, 'nothing in either the language or history

25   of Rule 23 . . . gives a court any authority to conduct a

26   preliminary inquiry into the merits of a suit in order to

27   determine whether it may be maintained as a class action.'"

28

Id. (quoting United Steel Workers, 593 F.3d at 808 (alterations in original) (other citations omitted).

Second, Bashas' main authority, Robinson, is non-binding Seventh Circuit precedent and distinguishable in one very critical respect. There, a correction officer applicant brought a Title VII putative class action. Challenging that applicant's adequacy as a class representative, the defendant employer came forth with evidence showing that that applicant "had been turned down because of his very poor employment record, which among other things contained an unexplained 27-month gap between jobs." Robinson, 163 F.3d at 1156. Due to that employment history, the district court denied class representative status to that applicant. Holding, *inter alia*, that class certification was properly denied, the Robinson Court reasoned:

> [I]f when class certification is sought it is already apparent -- as it was here because of Robinson's employment history as shown on the application that he submitted to the Sheriff's office -- that the class representative's claim is extremely weak, this is an independent reason to doubt the adequacy of his representation.

Id. at 1157 (citations omitted). The Court further reasoned, that if a named plaintiff's "claim is a *clear* loser at the time he asks to be made class representative, then approving him as a class representative can only hurt the class." Id. at 1158 (emphasis in original).

In sharp contrast to Robinson, the asserted weakness in Ms. Martinez's claims -- her failure to disclose them during bankruptcy -- has nothing whatsoever to do with the merits.

According to Bashas', Ms. Martinez's claims herein are weak because she did not disclose them during bankruptcy.  Bashas' does not assert, and it would be hard-pressed to, that Ms. Martinez's pay claim is "extremely weak," much less a "clear loser" on the merits.  Thus, Ms. Martinez's failure to disclose her potential claims is not "an independent reason to doubt the adequacy of her representation."  See Robinson, 167 F.3d at 1156 (citations omitted).

### ii. Credibility

Emphasizing that Ms. Martinez signed the declaration accompanying the Schedule B Form under penalty of perjury, Bashas' strongly implies that Ms. Martinez has credibility issues which impact her adequacy as a class representative.  "[C]redibility is a relevant consideration with respect to the adequacy analysis[.]"  Keegan, 2012 WL 2250040, at *14 (internal quotation marks and citations omitted).  At the same time, however, "credibility problems must relate to issues directly relevant to the litigation or there are confirmed examples of dishonesty, such as a criminal conviction for fraud."  Id. (internal quotation marks and citations omitted).  Thus, even if the court were to find, which it does not, that Ms. Martinez's credibility is at issue because she did not disclose this lawsuit during bankruptcy, such credibility issue would not impact her ability to serve as a class representative.

To this point, the focus has been upon the first prong of adequacy – the absence of antagonism and sharing of interests between the named plaintiffs and the absentee class members.

As the foregoing discussion shows, there has been no showing that either plaintiffs Estrada or Martinez have any conflicts with putative class members.  That is only the first prong of the adequacy test, however.  As to the second, "will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class[,]" Ellis I, 657 F.3d at 985 (internal quotation marks and citation omitted), in Parra I this court found that they would by implication.  See Parra I, 2005 WL 6182338, at *20 - *22.  To be sure, at that time, the court was discussing appointment of class counsel pursuant to Fed.R.Civ.P. 23(g), and not adequacy under Rule 23(a)(4). There is no reason to revisit the issue of whether class counsel will vigorously prosecute this action, however, because Bashas' has not raised any other issues in that regard beyond those raised and resolved in Parra I.

Additionally, "[i]n assessing whether class representatives and their counsel will vigorously prosecute a class action litigation, courts may consider the actual progress of the proceedings to that point." Buckland v. Maxim Healthcare Services, Inc., 2012 WL 3705263, at *6 (C.D.Cal. Aug. 27, 2012) (internal quotation marks and citation omitted).  Although this action has not progressed beyond the class certification stage, it is not due to the failure of plaintiffs' counsel to vigorously prosecute this action.  In fact, their continued involvement at every step of this rather complicated and protracted litigation,  makes it abundantly clear that despite the passage of time, they remain willing and able to vigorously prosecute this action.

In short, as with the other Rule 23(a) requirements, the court finds that the adequacy requirement has been satisfied. Having shown that all four elements of Rule 23(a) are met as to the pay claim, the next issue is whether this action "fit[s] into one of the three categories described in subdivision (b)[]" of Rule 23. _Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co._, 559 U.S. 393, 130 S.Ct. 1431, 1437, 176 L.Ed.2d 311 (2010) (internal quotation marks omitted)).

### B. Fed.R.Civ.P. 23(b)(3)

As previously discussed, after _Dukes_, plaintiffs are seeking class certification of their pay claim solely pursuant to Rule 23(b)(3). That Rule, "as an adventuresome innovation, is designed for situations in which class-action treatment is not as clearly called for." _Comcast_, 133 S.Ct. at 1432 (internal quotation marks and citations omitted). "That explains Congress's addition of procedural safeguards for (b)(3) class members beyond those provided for (b)(1) or (b)(2) class members (_e.g._, an opportunity to opt out), and the court's duty to take a "'close look'" at whether common questions predominate over individual ones." _Id._ (quoting _Amchem Prods., Inc. v. Windsor_, 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

Certification pursuant to Rule 23(b)(3) "is appropriate 'whenever the actual interests of the parties can be served best by settling their differences in a single action.'" _Hanlon_, 150 F.3d at 1022 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure

§ 1777 (2d ed.1986) ("Wright & Miller").  The "only
prerequisites" for certification under Rule 23(b)(3) "are that
'the questions of law or fact common to class members
predominate over any questions affecting only individual class
members, and that a class action is superior to other
available methods for fairly and efficiently adjudicating the
controversy.'" Dukes, 131 S.Ct. at 2558 (quoting
Fed.R.Civ.P.23(b)(3)).  The questions of predominance and
superiority "are interrelated because '[i]mplicit in the
satisfaction of the predominance test is the notion that the
adjudication of common issues will help achieve judicial
economy.'" York v. Starbucks Corp., 2011 WL 8199987, at *31
(C.D.Cal. Nov. 23, 2011) (quoting, inter alia, Valentino v.
Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996)).

### 1. Predominance

"[T]here is substantial overlap between" the test for
commonality under Rule 23(a)(2) and the predominance test
under 23(b)(3).  Wollin v. Jaguar Land Rover North America
LLC, 617 F.3d 1168, 1172 (9th Cir. 2010).  However, "[i]f
anything, Rule 23(b)(3)'s predominance criterion is even more
demanding than Rule 23(a)." Comcast, 133 S.Ct. at 1432
(citing Amchem, 521 U.S. 591, 623-24, 117 S.Ct. 2231).
Consequently, "the presence of commonality alone is not
sufficient to fulfill Rule 23(b)(3)." Hanlon, 150 F.3d at
1022.  The predominance inquiry "trains on legal or factual
questions that qualify each class member's case as a genuine
controversy." Amchem, 521 U.S. at 625, 117 S.Ct. 2231.  In
contrast to Rule 23(a)(2), "[t]he predominance analysis under

Rule 23(b)(3) focuses on the relationship between the common and individual issues in the case and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Wang, 709 F.3d at 835 (internal quotation marks and citation omitted).  As the Supreme Court recently emphasized in Amgen, "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." Amgen, 133 S.Ct. at 1191 (emphasis in original). Hence, "the office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the metho[d] best suited to adjudication of the controversy fairly and efficiently." Id. (internal quotation marks omitted).

The Ninth Circuit recognizes that "'there is clear justification for handling the dispute on a representative rather than an individual basis' if 'common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication[.]'" Mazza, 666 F.3d at 589 (quoting, *inter alia*, Hanlon, 150 F.3d at 1022).  In contrast, "'if the main issues in a case require the separate adjudication of each class member's individual claim or defense, . . . , a Rule 23(b)(3) action would be inappropriate.'" Keegan, 284 F.R.D. at 256 (quoting, *inter alia*, Zinser v. Accufix Research Institute, Inc., 253 F.3d 1180, 1186 (9th Cir.), amended by 273 F.3d 1266 (9th Cir. 2001)). "This is because, *inter alia*, the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of confusion are

magnified.'" <u>Id.</u> (quoting <u>Zinser</u>, 253 F.3d at 1186). "Courts must thus separate the issues subject to 'generalized proof' from those subject to 'individualized proof' to determine whether plaintiffs have satisfied the predominance requirement." <u>Ellis II</u>, 285 F.R.D. at 537 (citation omitted).

The predominance analysis "'begins . . . with the elements of the underlying cause of action.'" <u>Stearns</u>, 655 F.3d at 1020 (quoting <u>Erica P. John Fund, Inc., v. Halliburton Co.</u>, 563 U.S. ----, ----, 131 S.Ct. 2179, 2184, 180 L.Ed.2d 24 (2011)). Here, plaintiffs are alleging that "Bashas' two-tiered  wage policy constitutes disparate treatment and/or has had a disparate impact on Hispanic Food City workers in violation of Title VII and Section 1981." Pls.' Supp. Br. (Doc. 302) at 21:3-5. Resolution of that "central *liability* issue[] . . . involves *no* individual questions[,]" plaintiffs argue. <u>Id.</u> at 21:2-3; 21:5 (emphasis in original). Plaintiffs further argue that the "only individual determination to be made" -- the amount of back pay -- "does not defeat class certification." <u>Id.</u> at 21:6; 22:1 (citing <u>Yokoyama v. Midland Nat'l Life Ins. Co.</u>, 594 F.3d 1087, 1089 (9th Cir. 2010)). And, as plaintiffs are quick to point out, the Ninth Circuit in <u>Parra II</u> rejected Bashas' argument that "[t]he claimed difficulties in the calculations of damages, as they affected the various class members . . . preclude[d] class certification." <u>Parra II</u>, 536 F.3d at 979. What is more, just recently, the Ninth Circuit reaffirmed its long-held view that "'[t]he amount of damages is invariably an individual question and does not defeat

class action treatment.'" <u>Leyva v. Medline Industries Inc.</u>,
2013 WL 2306567, at *3 (9th Cir. May 28, 2013) (quoting
<u>Blackie v. Barrack</u>, 524 F.2d 891, 905 (9th Cir. 1975) (other
citation omitted).

Perhaps because the Supreme Court in Dukes clarified that
"individualized monetary claims[,]" such as plaintiffs' back
pay claims herein, "belong in Rule 23(b)(3)[,]" <u>Dukes</u>, 131
S.Ct. at 2558, Bashas' agrees that individual damage issues
alone do not defeat class certification under that Rule.   <u>See</u>
<u>Stearns</u>, 655 F.3d at 1026 (citing <u>Yokoyama</u>, 594 F.3d at 1094)
("We have held that the mere fact that there might be
differences in damage calculations is not sufficient to defeat
class certification.")  Nonetheless, Bashas' insists that
plaintiffs have not established predominance because
"[q]uestions regarding liability would require . . . highly
fact-specific inquiries regarding whether or not the
Plaintiffs' alleged discriminatory pay . . . w[as] the result
of discrimination or some other, non-discriminatory factor."
Def.'s Supp. Br. (Doc. 301) at 19:26-20:1.  This argument is
based upon two faulty assumptions – one pertaining to the
nature of plaintiffs' pay claim and the other to the proof in
that regard.

Although plaintiffs have explicitly renounced their
Subjective Placement claim, Bashas' still insists that
plaintiffs' pay claim involves "subjective decision-making[]"
where "individual store managers, acting at their own
discretion, decided where to *place* employees on the wage
scale."  Def.'s Resp. (Doc. 304) at 7:19 (citations omitted);

6:22-23 (emphasis added).  From Bashas' standpoint, the
exercise of that discretion "set the employees' wage history
in motion, and it is a key issue in this case."  Id. at 6:23-
25.  Characterizing plaintiffs' pay claim in that way, Bashas'
posits that defending such a claim would involve assessing
"numerous . . . subjective decisions regarding placement of
members, in the proposed class, on the pay scales."  Id. at
8:13-15. Such an assessment is incompatible with a finding of
predominance in Bashas' view.

Perhaps Bashas' argument would have some validity if
plaintiffs were still pursuing their Subjective Placement
claim, but they are not.  At the risk of repetition,
plaintiffs' pay claim is based strictly on Bashas' wage
scales, and is independent of their foregone Subjective
Placement claim.  Thus, the ostensibly individualized nature
of that Subjective Placement claim is not germane to the issue
of whether common issues predominate with respect to
plaintiffs' pay claim, predicated solely upon Bashas' wage
scales.

The second faulty assumption under which Bashas' is
operating is that "[p]laintiffs have not produced any actual
evidence that Bashas' operated under a single, common policy
of discrimination."  Def.'s Supp. Br. (Doc. 301) at 20:2-3.
As discussed with respect to commonality, plaintiffs have
identified a specific employment policy, i.e., Bashas' wage
scales, which have caused a pay disparity.  See Ellis II, 285
F.R.D. at 538 (finding predominance where "[p]laintiffs . . .
presented significant proof that Costco operates under a

1  common, nationwide promotion system for [certain] positions

2  and have identified specific employment practices that have

3  caused a disparity in promotions[]"). Further, because

4  plaintiffs contend that Bashas' wage scales are

5  "discriminatory, both under a disparate treatment and a

6  disparate impact theory[,] . . . [r]esolution of Plaintiffs'

7  challenge to those [wage scales] will resolve significant

8  issues with respect to the class as a whole and this dwarfs

9  the individualized issues[.]" See id. (citing Stinson v. City

10  of New York, 282 F.R.D. 360, 382 (S.D.N.Y. 2012) ("'Class-wide

11  issues predominate if resolution of some of the legal or

12  factual questions that qualify each class member's case as a

13  genuine controversy can be achieved through generalized proof,

14  and if these particular issues are more substantial than the

15  issues subject only to individualized proof.'") (quoting Moore

16  v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002)).

17  More closely considering plaintiffs' specific theories of

18  liability, disparate treatment and disparate impact, yields

19  the same result. On that point, the court finds persuasive

20  the reasoning in Ellis II. There, with respect to the

21  disparate treatment claim, the court explained:

22          whether Defendant has engaged in a
        pattern or practice of discrimination

23          such that all class members are entitled
        to a presumption of discrimination under

24          the *Teamsters* method of proof[38] is a common

25

26      [38]   "As the Supreme Court reaffirmed in *Dukes*, pattern-or-practice cases alleging disparate treatment under Title VII typically follow a bifurcated, burden-shifting structure laid out by Int'l Broth. of Teamsters

27  v. United States, 431 U.S. 324 (1977):

28          We have established a procedure for trying
        pattern-or-practice cases that gives effect to
        [Title VII's] statutory requirements. When the

1         issue subject to classwide resolution. This
    'pattern and practice question predominates
2   because it has a direct impact on every
    class member's effort to establish liability
3   and on every class member's entitlement
    to . . . monetary relief.'  Ingram v. The
4   Coca-Cola Co., 200 F.R.D. 685, 699
    (N.D.Ga. 2001) (certifying (b)(3) class of
5   plaintiffs alleging a pattern or practice
    of race discrimination in employment under
6   Teamsters framework); see also Williams
    v. Mohawk Indus., Inc., 568 F.3d 1350,
7   1357 (11th Cir. 2009) ("Common issues of fact
    and law predominate if they ha[ve] a direct
8   impact on every class member's effort to
    establish liability and on every class
9   member's entitlement to injunctive
    and monetary relief.") (internal citations
10  and quotation marks omitted).

11  Ellis II, 285 F.R.D. at 538 (footnote added).  The Ellis II

12  court similarly explained as to plaintiffs' disparate impact

13  claim:

14        whether Defendant's facially neutral
    policies and practices have a disparate
15  impact on class members, and whether those
    practices are nonetheless justified by
16  business necessity, are similarly
    issues best addressed with respect to
17  the entire class. . . . Adjudicating these
    issues on a classwide basis is necessary before
18  any individualized proceeding can occur.

19  Id. (citations and footnote omitted).  Adopting that

20  rationale, the court finds that the common questions regarding

21  liability as to the pay claim are "a significant aspect of

22

23        plaintiff seeks individual relief such as
    reinstatement or backpay after establishing a pattern
24  or practice of discrimination, a district court
    must usually conduct additional proceedings . . .
25  to determine the scope of individual relief. . . .
    At this phase, the burden of proof will shift to the
26  company, but it will have the right to raise any
    individual affirmative defenses it may have, and to
27  demonstrate that the individual applicant was
    denied an employment opportunity for lawful reasons. . . .
28
    Ellis II, 285 F.R.D. at 505 (quoting Dukes, 131 S.Ct. at 2552 n. 7)
    (internal quotations and citations omitted).

th[is] case and they can be resolved for all members of the
class in a single adjudication[.]" See Mazza, 666 F.3d at 589
(internal quotation marks and citations omitted).

Before addressing superiority, the court also must
consider  whether plaintiffs' damages can be determined on a
classwide basis.  See Comcast, 133 S.Ct. at 1432  ("the proper
standard for evaluating certification" requires a showing
"that damages are capable of measurement on a classwide
basis[]").  In Comcast,  an antitrust action, the district
court accepted one of plaintiffs' four theories of antitrust
impact, but rejected the other three theories.   Despite that
limitation, the plaintiffs relied on a regression model that
"did not isolate damages resulting from any one theory of
antitrust impact." Comcast, 133 S.Ct. at 1431).

Both the district court and the Third Circuit declined to
entertain the defense argument challenging plaintiffs'
regression model because "those arguments would also be
pertinent to the merits determination[.]" Id. at 1433.
Finding "[t]hat reasoning to flatly contradict[]" prior
Supreme Court precedent, and Dukes in particular, the Court
reversed the class certification order.  Id. (citation
omitted).  In reversing, the Comcast Court chastised the Third
Circuit for "simply conclud[ing] that respondents provided a
method to measure and quantify damages on a classwide basis,"
without deciding whether the methodology [was] a just and
reasonable inference or speculative."  Id. (internal quotation
marks and citation omitted)

In the present case, unlike Comcast, plaintiffs'

methodology (although not fully developed[39]) for calculating back pay demonstrates that such damages are "capable of measurement on a classwide basis.  See Comcast, 133 S.Ct. at 1433.  "Here, unlike Comcast, if putative class members prove [Bashas'] liability, damages will be calculated based on the wages each employee lost due to [Bashas'] unlawful practices."  See Leyva, 2013 WL 2306567, at *3.  If Bashas' is found liable, it strikes the court, as the plaintiffs urge, that the back pay determination "is a purely mechanical process[.]"  Pls.' Supp. Br. (Doc. 302) at 21:7.  Furthermore, through a computer program, and relying upon "objective factors" such as "the individual employee payroll record (dates of employment job position, hours worked) and the wage scale," which is part of the record, the plaintiffs will be able to calculate back pay losses for "each eligible class member[.]" Id. at 21:15-18.  Under this projected scenario, there is no concern, as there was in Comcast, that "[q]uestions of individual damages calculations will inevitably overwhelm questions common to the class[]".  See Comcast, 133 S.Ct. at 1433.  In addition, also in sharp contrast to Comcast, at least at this point, plaintiffs' methodology for calculating back pay correlates the "legal theory of the harmful event" with "the economic impact of that event.  See id. at 1435 (internal quotation marks, emphasis and citation omitted).  Having found

---

[39]   Plaintiffs "anticipate having an expert witness present" their backpay "analysis[,]" consisting of "a mathematical calculation conducted for each eligible class member to determine individual back pay losses." Pls.' Supp. Br. (Doc. 302) at 21:17-19 (emphasis in original).  The court cannot fault plaintiffs for not having provided such an analysis in conjunction with their prior filings, as they did not have the benefit, nor could they have anticipated at that time, the Supreme Court's  March 27, 2013 Comcast decision.

1   predominance, it is necessary to consider superiority, the

2   second Rule 23(b)(3) element.

3          ***2.  Superiority***

4      "'[T]he purpose of the superiority requirement is to

5   assure that the class action is the most efficient and

6   effective means of resolving the controversy.'"  <u>Wolin v.</u>

7   <u>Jaguar Land Rover North America, LLC</u>, 617 F.3d 1168, 1175 (9th

8   Cir. 2010) (quoting  Wright & Miller, § 1779 at 174); <u>see also</u>

9   <u>Valentino v. Carter-Wallace, Inc.</u>, 97 F.3d 1227, 1234 (9th

10  Cir. 1996) (Superiority tests whether "class litigation of

11  common issues will reduce litigation costs and promote greater

12  efficiency.")  "The superiority inquiry under Rule 23(b)(3)

13  requires determination of whether the objectives of the

14  particular class action procedure will be achieved in the

15  particular case."  <u>Hanlon</u>, 150 F.3d at 1023 (citation

16  omitted).  In turn, that inquiry "necessarily involves a

17  comparative evaluation of alternative mechanisms of dispute

18  resolution."  <u>Id.</u>  The Ninth Circuit recognizes that

19  "[d]istrict courts are in the best position to consider the

20  most fair and efficient procedure for conducting any given

21  litigation, . . . , and so must be given wide discretion to

22  evaluate superiority[.]"  <u>Bateman</u>, 623 F.3d at 712 (internal

23  quotation marks and citations omitted).

24     Plaintiffs offer two reasons as to why  "[c]lass

25  treatment is clearly the superior method for adjudicating the

26  pay claims."  Pls.' Supp. (Doc. 302) at 22:20.  First, class

27  certification would be less costly and more efficient.

28  Second, most of the putative class members "lack the

resources" to fund this litigation, and so would be "deterred or prevented" from pursuing their discrimination claims.  <u>Id.</u> at 22:25-26.

Conversely, Bashas' asserts that plaintiffs have not shown superiority because, first of all, there are only a "limited number of allegedly affected named plaintiffs and class members[.]" Def.'s Supp. Br. (Doc. 301) at 20:11-12. Supposedly, superiority also cannot be shown because putative class members "retain[] a strong incentive to bring their claims individually[.]" <u>Id.</u> at 20:13-14.  Finally, harkening back to its familiar refrain that this lawsuit involves "thousands of highly-individualized factual inquiries[,]" Bashas' contends that is another reason why Rule 23(b)(3) certification is "inappropriate."  <u>Id.</u> at 20:18-19.

Class action in accordance with Rule 23(b)(3) is the superior method of adjudicating plaintiffs' claims, despite what Bashas' argues.  Without class certification, as plaintiffs accurately point out, each individual employee will have to  separately "prove . . . that [Bashas'] maintained a two-tiered wage policy, that the policy . . . disproportionately impacted Hispanic Food City employees, and/or that the policy constituted disparate treatment based upon national origin." Pls.' Supp. (Doc. 302) at 22:21-25. Plainly, "[i]t is far more efficient to litigate" these fundamental liability issues "on a classwide basis rather than in thousands of individual and overlapping lawsuits."  <u>See</u> <u>Wolin</u>, 617 F.3d at 1176 (Rule 23(b)(3) class certification proper in an "automobile-wear" case alleging "single,

defective alignment geometry[]" where "issues common to all
class members . . . can be litigated together[]"); see also
Jordan v. Paul Financial, LLC, 285 F.R.D. 435, 467 (N.D.Cal.
2012) (internal quotation marks and citation omitted) ("[A]
single action would be superior to maintaining a multiplicity
of individual actions involving similar legal and factual
issues.")  As the Ninth Circuit reasoned in Wolin, "[f]orcing
individual[s] . . . to litigate their cases, particularly
where common issues predominate for the proposed class, is an
inferior method of adjudication."  Wolin, 617 F.3d at 1176.

Further, in the present case, much like Wolin, "[p]roposed
class members face the option of participating in this class
action, or filing hundreds of individual lawsuits that could
involve duplicating discovery and costs that [potentially]
exceed the extent of proposed class members' individual
injuries."  See id.  Avoiding that latter scenario is the
precise reason for Rule 23(b)(3) class certification.  See
Amchem, 521 U.S. at  615, 117 S.Ct. 2231 (quoting Advisory
Committee's Notes on Rule 23(b)(3)) (that Rule is intended "to
cover cases 'in which a class action would achieve economies
of time, effort, and expense, and promote . . . uniformity of
decision as to persons similarly situated, without sacrificing
procedural fairness or bringing about other undesirable
results.'"); see also York, 2011 WL 8199987, at *33 (citations
omitted)("Typically, a class action is superior if the case
presents a large volume of individual claims that could strain
judicial resources if tried separately and if each potential
plaintiff's recovery may not justify the cost of individual

litigation.") Indeed, the Ninth Circuit has consistently held that "[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." Wolin, 617 F.3d at 1175 (citing Zinser, 253 F.3d at 1189; Hanlon, 150 F.3d at 1023).

Neither the supposedly "limited number" of potential class members, or their assertedly "strong incentive" to individually pursue their claims persuades the court that Rule 23(b)(3) is not the proper vehicle for plaintiffs to litigate their claims. See Def.'s Supp. Br. (Doc. 301) at 20:11; and at 20:13. Bashas' initial argument against a finding of superiority is that there are a "limited number" of putative class members. Id. at 20:11. Bashas' failure to elucidate on that point is troubling given its prior assertion that plaintiffs are "seek[ing] to certify a class of at least 10,000[.]" Id. at 11:16. Moreover, that ten thousand figure hardly seems "limited," especially considering that it is based upon a "very modest assumption" of industry-wide "turnover rates[.]" Id. at 11:17-18. Bashas' cannot have it both ways; it cannot argue, in essence, that the class is too large for commonality purposes, but not for superiority.

Additionally, in holding that numerosity had been shown here, this court previously found, and Bashas' did not dispute, that the putative class has "thousands of members[.]" See Parra I, 2005 WL 6182338, at *14 (citing Mot. (Doc. 159) at 18 [("Bashas' has employed between 3000 and 4440 Hispanic workers in hourly positions in the Food City stores in each

1   year since 2000.)"]; Decl'n Drogin (Doc. 160) at Exhbt. 1.)

2   Hence, the number of potential class members does not render

3   Rule 23(b)(3) certification improper.

4        Likewise, the court is not convinced by Bashas'

5   "incentive" argument.  Def.'s Supp. Br. (Doc. 301) at 20:13.

6   Bashas' postulates that plaintiffs have not shown superiority

7   because the putative class members "retain[] a strong

8   incentive to bring their claims individually," otherwise, they

9   "risk being precluded from asserting individual claims for

10  compensatory damages of up to $300,000,[40] limited by the

11  applicable statutory cap, if they choose to 'tie their fates

12  to the class representatives.'"  Id. at 20:13-17 (quoting

13  Dukes, 131 S.Ct. at 2559).  Once again, Bashas' overlooks a

14  critical distinction between Dukes and the present case.

15       The concern in Dukes was that the strategy of including

16  only backpay claims "created the possibility . . . that

17  individual class members' compensatory-damages claims would be

18  precluded by litigation they had no power to hold themselves

19  apart from."  Dukes, 131 S.Ct. at 2559 (emphasis in original).

20  The Court explained:

21               If it were determined, for example, that
                 a particular class member is not entitled
22               to backpay because her denial of increased
                 pay or a promotion was not the product
23               of discrimination, that employee might
                 be collaterally estopped from independently
24               seeking compensatory damages based on
                 that same denial. That possibility underscores
25               the need for plaintiffs with individual
                 monetary claims to decide for themselves

26  
───────────────────

27       [40]   Section 1981a(b)(3) imposes a statutory limitation on, among

28  other types of damages, compensatory and punitive damages in Title VII
    suits against employers with more than 500 employees.  Hemmings v.
    Tidyman's Inc., 285 F.3d 1174, 1200 (9th Cir. 2002); 42 U.S.C.
    § 1981a(b)(3)(D).

1
2
3

> whether to tie their fates to the
> class representatives' or go it alone-a
> choice Rule 23(b)**(2)** does **not** ensure that they
> have.

4  *Id.* (italicized emphasis in original) (bold emphasis added).

5  Those concerns are absent here.  Unlike a Rule 23(b)(2) class,

6  which is mandatory, a Rule 23(b)**(3)** class contains an opt-out

7  provision.  See Fed.R.Civ.P. 23(c)(2)(B)(v).  That latter Rule

8  is the sole basis for certifying plaintiffs' pay claim.

9  Therefore, as a result of  Rule 23(b)(3)'s opt-out mechanism,

10  there is no risk, as there was in Dukes, where certification

11  was sought pursuant to Rule 23(b)(2), of depriving a putative

12  class member in this case of the opportunity of proceeding

13  with his or her own individual monetary claims.

14      Lastly, Bashas' argument that a class action is not a

15  superior method of adjudicating the pay claims because it

16  "would require thousands of highly-individualized factual

17  inquiries," rings hollow given the nature of those claims and

18  the relief sought, as previously discussed.  See Def.'s Supp.

19  Br. (Doc. 301) at 20:18-19.  Consequently, for the reasons

20  just discussed, the court finds that certification of a class

21  pursuant to Fed.R.Civ.P. 23(b)(3) with respect to plaintiffs'

22  pay claim satisfies the most fundamental test for superiority

23  -- "maintenance of this litigation as a class action is

24  efficient and . . . it is fair."  See Wolin, 617 F.3d at 1175-

25  76.

26      ***C.  Fed.R.Civ.P. 23(b)(3)(A)-(D)***

27      An examination of predominance and superiority involves

28  additional considerations.  "In evaluating predominance and

1   superiority, the Court *must* consider: (1) the extent and

2   nature of any pending litigation commenced by or against the

3   class involving the same issues; (2) the interest of

4   individuals within the class in controlling their own

5   litigation; (3) the convenience and desirability of

6   concentrating the litigation in a particular forum; and (4)

7   the manageability of the class action."[41]  Beck-Ellman v. Kaz

8   USA, Inc., 283 F.R.D. 558, 567 (S.D.Cal. 2012)(citing

9   Fed.R.Civ.P. 23(b)(3)(A)-(D); Amchem, 521 U.S. at 615-16, 117

10  S.Ct. 2231)) (emphasis added).  These factors "'require[] the

11  court to focus on the efficiency and economy elements of the

12  class action so that cases allowed under subdivision (b)(3)

13  are those that can be adjudicated most profitably on a

14  representative basis.'"  Zinser, 253 F.3d at 1190 (quoting 7A

15  Wright & Miller, § 1780 at 562). The application of four

16  enumerated factors, which the parties largely ignored,

17

18      [41]     The Ninth Circuit in Bateman, was confronted with the issue of
19  whether Rule 23(b) "authorizes a court to consider whether certifying a
    class would result in disproportionate damages." Bateman, 623 F.3d at 713.
20  Because Rule 23(b)(3) "provide[d] little, if any guidance, on" that issue,
    the Court recognized the propriety of expanding the inquiry thereunder to
21  include factors not listed in Rule 23(b)(3)(A)-(D):

22          Superiority must be looked at from the point of
            view (1) of the judicial system, (2) of the
23          potential class members, (3) of the present plaintiff,
            (4) of the attorneys for the litigants, (5) of
24          the public at large and (6) of the defendant. The
            listing is not necessarily in order of importance
25          of the respective interests. Superiority must also
            be looked at from the point of view of the issues.

26  Id. (quotation marks and citations omitted).  Here, there is no need for the
    court to delve into those non-listed factors because, first of all, a
27  consideration of those factors is discretionary, not mandatory.  See id.
    (emphasis added) ("A court *may* consider, other, non-listed factors[]" in
28  deciding whether to certify a class under Rule 23(b)(3).) Second, in
    contrast to Bateman, the listed Rule 23(b)(3) factors encompass the concerns
    relevant here to class certification thereunder.

1  buttresses the finding that Rule 23(b)(3)'s predominance and
2  superiority requirements are met here.

3      The first factor considers the interest of each member in
4  "individually controlling the prosecution or defense of
5  separate actions[.]"  Fed.R.Civ.P. 23(b)(3)(A). Given the
6  "common questions affecting the class as a whole at the
7  liability stages of this matter, and given [the putative]
8  class members' ability to opt out [,]" the putative class
9  members in the present case "have a diminished interest in
10 individually controlling the common portions of this action."
11 See Ellis II, 285 F.R.D. at 539-540.

12     Further, "[w]here damages suffered by each putative class
13 member are not large, this factor weighs in favor of
14 certifying a class action."  Zinser, 253 F.3d at 1190
15 (citation omitted).  That is because the policy "at the very
16 core of the class action mechanism is to overcome the problem
17 that small recoveries do not provide the incentive" for
18 individuals to bring claims.  Amchem Prods., 521 U.S. at 617.
19 Here, the FAC does not allege the specific amount of damages
20 sought, and the plaintiffs have given no indication as to
21 whether those damages are sizeable or not.  In Parra II, the
22 Ninth Circuit estimated that the "hourly disparities
23 translate[d] to annual salary differences of around $300 per
24 year to almost $6,000 per year."  See Parra II, 536 F.3d at
25 977.  Recoveries in that range are relatively modest.  For
26 both of these reasons, the first factor weighs in favor of
27 class certification.

28     The second factor is "the extent and nature of any

litigation concerning the controversy already begun by or against class members[.]" Fed.R.Civ.P. 23(b)(3)(B). Arguably, E.E.O.C. v. Bashas', Inc., No. CIV 09-0209 PHX RCB, wherein the EEOC is seeking to enforce an administrative subpoena against Bashas', fits the definition of such litigation.  The EEOC's subpoena, the enforcement of which Bashas' has vigorously challenged, is "part of the EEOC's "ongoing investigation into whether Bashas' has engaged in discrimination against its Hispanic employees on the basis of national origin with respect to wages and promotions." E.E.O.C. v. Bashas', Inc., 828 F.Supp.2d 1056, 1059 (D.Ariz. 2011) (internal quotation marks and citation omitted).

The parties are fully aware of that action as they have participated either directly or indirectly in that litigation. For now, the details are not important; suffice it to say that that case is pending in the Ninth Circuit Court of Appeals.  Given that Bashas' EEOC action is in its relative infancy, and the court would have to speculate as to how that action might, at some future date, impact the present case, it finds that the second factor also weighs in favor of class certification.

The third factor, "the desirability or undesirability of concentrating the litigation of the claims in the particular forum[,]" also augurs in favor of class certification.  See Fed.R.Civ.P. 23(b)(3)(C). "Here, there is no reason to believe that concentrating this action in this Court is undesirable," especially because "the proposed []class is composed of only [Arizona] . . . employees."  See York, 2011 WL 8199987, at

*33.

    The fourth and final factor considers "the likely
difficulties in managing a class action."  Fed.R.Civ.P.
23(b)(3)(D).   This factor looks to whether "the complexities
of class action treatment outweigh the benefits of considering
common issues in one trial[.]"  Zinser, 253 F.3d at 1192
(citations omitted).  If they do, "class action treatment is
not the superior method of adjudication."  Id. (internal
quotation marks and citations omitted).  This balancing test
"encompasses the whole range of practical problems that may
render the class format inappropriate for a particular suit."
Eisen v. Carlisle & Jacqueline, 417 U.S. 156, 164, 94 S.Ct.
2140, 40 L.Ed.2d 732 (1974).

    At this juncture, and without the parties' input, it is
difficult to conceive how the complexities of class
certification here would outweigh the benefits. Cf. In re:
Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 140
(2nd Cir. 2001) (Sotomayor, J.) ("[F]ailure to certify an
action under Rule 23(b)(3) on the sole ground that it would be
unmanageable is disfavored, and should be the exception rather
than the rule.")  The court thus finds that this factor, too,
favors class certification pursuant to Rule 23(b)(3).  If at
some point the pay claim does become unmanageable as a class
action, which the court does not anticipate, the court
"retains the flexibility to address problems with a certified
class as they arise, including the ability to decertify."
United Steel Workers, 593 F.3d at 807.

    Overall, based upon the foregoing, the court finds that

1 the named plaintiffs' pay claim is properly certified pursuant

2 to Rule 23(b)(3).  The court's analysis does not end here,

3 however, because although it previously certified plaintiffs'

4 working condition claim, the propriety of that certification

5 has become an issue after Dukes.

6 **II.  *Working Conditions Claim*[42]**

7      Rule 23(b)(2) provides in relevant part that if the

8 elements of Rule 23(a) are met, and if "the party opposing the

9 class has acted or refused to act on grounds that apply

10 generally to the class, so that final injunctive relief or

11 corresponding declaratory relief is appropriate respecting the

12 class as a whole[,] [a] class may be maintained[.]"  Fed. R.

13 Civ. P. 23(b)(2).  Pursuant to that Rule, in Parra I, this

14 court certified a class as to working conditions comprised of:

15           All Hispanic workers employed by defendant in
           an hourly position at any Food City retail store
16           since April 4, 1998, who have been or may be subject
           to the challenged disparate working conditions.

17

18 Parra I, 2005 WL 6182338, at *22.  Bashas' appealed only the

19 denial of class certification as to the pay claim, leaving

20 undisturbed the certification of the working conditions claim.

21      **A.  *Decertification***

22      Now, based upon Dukes' "newly clarified commonality

23

24           [42]      Plaintiffs imply that Bashas' disregarded this court's order by
25 addressing the working conditions claim in its supplemental briefs.  While
   setting the post-Dukes briefing schedule, however, Bashas' explicitly
26 inquired as to the propriety of "rais[ing] the issue of reconsideration of
   [this court's prior] certification of [the] store conditions" claim, or
27 whether the court wanted that issue addressed separately.  Tr. (June 27,
   2011) at 10:42:09 a.m. - 10:42:16 a.m.  The court responded that it would
   not "preclude" Bashas' from raising that claim in the supplemental briefs.
28 Tr. (June 27, 2011) at 10:42:26 - 10:42: 26 a.m.  Consequently, the issue
   of the continued certification of the working conditions claim is properly
   before the court.

1    standard," Def.'s Resp. (Doc. 304) at 6:1-2, Bashas' "requests

2    that the Court  reconsider . . . and deny" class certification

3    of the working conditions claim.  Def.'s Supp. Br. (Doc. 301)

4    at 20:22-23.  Bashas' response more accurately requests "*de-*

5    *certif*[*ication*]" of the working conditions claim, however, as

6    will soon become evident.  Def.'s Resp. (Doc. 304) at 8:20

7    (emphasis added).

8        Interpreting Bashas' request as strictly one for

9    reconsideration, plaintiffs argue that it is "untimely[.]"

10   Pls.' Reply (Doc. 303) at 10:10.  There are two prongs to this

11   argument.  Neither is meritorious.  First, plaintiffs note

12   that Bashas' did not appeal class certification of the working

13   conditions claim pursuant to Fed.R.Civ.P. 23(f).   That Rule

14   allows a party, within 14 days after entry of the class

15   certification order, to file with the court of appeals a

16   petition for permission to appeal the granting or denying of

17   class certification.  The filing of a Rule 26(f) petition is

18   separate and distinct from filing a reconsideration or

19   decertification motion, however.  Therefore, although Bashas'

20   did not avail itself of Rule 23(f), it does not follow, as

21   plaintiffs' so strongly imply, that Bashas' current request is

22   untimely.

23       Second, plaintiffs baldly assert that  Bashas' "did not

24   . . . timely" move "for reconsideration[.]" Id. at 10:7. Even

25   if the court were to agree,[43] it would not preclude Bashas'

26

27       [43]    LRCiv 7.2(g)(2) provides that "[a]bsent  good cause shown, any
     motion for reconsideration shall be filed no later than fourteen (14) days
28   after the date of the filing of the Order that is the subject of the
     motion." LRCiv 7.2(g)(2).  Bashas' did not seek reconsideration within 14
     days after the filing of Parra I, and evidently that is the basis for
     plaintiffs' untimeliness argument.  Of course, such an argument presumes

1   from requesting decertification now.  Bashas' request is

2   timely given the considerable latitude a district court has to

3   revisit the class certification issue.  "A district court may

4   *decertify a class at any time*."  Rodriguez v. West Publ'g

5   Corp., 563 F.3d 948, 966 (9ᵗʰ Cir. 2009)(emphasis added)

6   (citing Falcon, 457 U.S. at 160, 102 S.Ct. 2364)  Federal Rule

7   of Civil Procedure 23(c)(1)(C) embodies that latitude:  "An

8   order that grants or denies class certification may be altered

9   or amended before final judgment."  Fed.R.Civ.P.  23(c)(1)(C).

10  Such an order is, therefore, "inherently tentative."  Coopers &

11  Lybrand v. Livesay, 437 U.S. 463, 469 n. 11, 98 S.Ct. 2454, 57

12  L.Ed.2d 351 (1978).  Thus, "[a] district court retains the

13  flexibility to address problems with a certified class *as they*

14  *arise*, including the ability to decertify."  United Steel

15  Workers, 593 F.3d at 809 (emphasis added).

16      This flexibility extends "'[e]ven after a certification

17  order is entered[.]'"  Id. (quoting Falcon, 457 U.S. at 160,

18  102 S.Ct. 2364) (other citations omitted).  Thus, "Rule 23

19  provides district courts with *broad authority* at *various*

20  *stages in the litigation* to revisit class certification

21  determinations and to redefine *or* decertify classes as

22  appropriate."  Wang, 709 F.3d at 836 (citing  Armstrong v.

23  Davis, 275 F.3d 849, 871 n. 28 (9ᵗʰ Cir. 2001), *abrogated on*

24  *other grounds by* Johnson v. California, 543 U.S. 499, 504-05,

25

26  the absence of "good cause."  In all likelihood, such a  presumption is not
27  warranted here, however, because Dukes was decided more than five years
    after Parra I.  And, LRCiv 7.2(g)(1) allows for the possibility of
28  reconsideration, *inter alia*, based upon a showing of "new . . . legal
    authority that could not have been brought to [the court's] attention
    earlier."   So even if the court were to treat Bashas' motion as one for
    reconsideration, a strong argument could be made that it is untimely.

1   125 S.Ct. 1141, 160 L.Ed.2d 949 (2005)) (emphasis added).
2   Indeed, somewhat presciently, relying upon Armstrong, Parra I
3   recognized that flexibility.   See Parra I, 2005 WL 6182338, at
4   *14.   The passage of time, therefore, is not a barrier to
5   Bashas' request for decertification of the working conditions
6   class, post-Dukes, as the foregoing shows.

7       The parties fundamentally disagree as to whether Dukes
8   affects certification of that class.   Plaintiffs argue that
9   Dukes "has no impact[,] Pls.' Supp. Brief (Doc. 302) at 24:28,
10  whereas Bashas' contends that plaintiffs should not be allowed
11  to "maintain" their working conditions claim because
12  commonality, as  articulated in Dukes, is missing here.
13  Def.'s Supp. Br. (Doc. 301) at 15:22.

14      **_B.  Standing_**

15      The court is not at liberty to address that conflict
16  without resolving the prefatory issue of standing, although
17  the parties did not.   See Pier 1 Imports (U.S.) Inc., 631 F.3d
18  939, 954 (9th Cir. 2011) (internal quotation marks and
19  citations omitted) ("[F]ederal courts are required sua sponte
20  to examine jurisdictional issues such as standing.")  "Mindful
21  that 'Rule 23's requirements must be interpreted in keeping
22  with Article III constraints[]'" the court must determine
23  whether named plaintiffs, Estrada and Martinez  have standing
24  to bring the working conditions claim.   See Evans v. Linden
25  Research, Inc., 2012 WL 5877579, at *6 (N.D.Cal. Nov. 20,
26  2012) (quoting Amchem, 521 U.S. at 613, 117 S.Ct. 2231); and
27  In re Abbott Labs. Norvir Antitrust Litig., 2007 WL 1689899,
28  at *2 (N.D.Cal. June 11, 2007) ("[I]t is 'well-settled that

1    prior to the certification of a class, and technically

2    speaking before undertaking any formal typicality or

3    commonality review, the district court must determine that at

4    least one named class representative has Article III standing

5    to raise each class subclaim.'") (quoting <u>Wooden v. Bd. of</u>

6    <u>Regents of Univ. Sys. of Georgia</u>, 247 F.3d 1262, 1287–88 (11th

7    Cir. 2001)).

8         Standing is an issue because, as plaintiffs stress, they

9    are seeking "*only injunctive relief*" in connection with their

10   working conditions claim, Pls.' Supp. Br. (Doc. 302) at 25:20

11   (emphasis in original); but, plaintiff Estrada, as a former

12   Food City employee,[44] lacks standing to sue for injunctive

13   relief against his former employer.  <u>See</u> <u>Walsh v. Nevada Dept.</u>

14   <u>of Human Resources</u>, 471 F.3d 1033, 1036, 1037 (9th Cir. 2006)

15   (former employee, who gave no indication in the complaint that

16   she was interested in returning to work for her former

17   employer, did not have standing to request injunctive relief

18   to force that former employer to "adopt and enforce lawful

19   policies regarding discrimination based on disability[]"); <u>see</u>

20   <u>also</u> <u>Hodgers-Durgin v. De La Vina</u>, 199 F.3d 1037, 1045 (9th

21   Cir. 1999) ("Unless the named plaintiffs are themselves

22

---

23        [44]    There is a discrepancy between the FAC and plaintiff Estrada's
24   declaration in support of class certification in terms of his employment
     status.  The FAC, filed March 11, 2004, alleges that plaintiff Estrada  "*is*
25   employed by . . . Bashas' at a Food City Store." FAC (Doc. 116) at 3:4-5,
     ¶ 7 (emphasis added).  Estrada's declaration filed September 27, 2004,
26   explicitly declares, however, that he "work*ed* at the Food City store . . .
     from April 1999 until July 2002." Estrada Decl'n (Doc. 176) at 1:23-24,
27   ¶ 1 (emphasis added).  Given that unequivocal declaration, presumably the
     FAC inadvertently alleges that Mr. Estrada was employed at a Food City
28   store in March, 2004.  Thus, especially given that in <u>Parra I</u> this court
     relied upon that declaration for Estrada's employment status, and that
     finding has never been challenged, the court will continue to treat him as
     a former Food City employee.  <u>See Parra I</u>, 2005 WL 6182338, at *17.

1  entitled to seek injunctive relief, they may not represent a
2  class seeking that relief.").

3      Plaintiff Estrada's lack of standing does not foreclose
4  plaintiffs from pursuing their working conditions claim, so
5  long as plaintiff Martinez has standing.  See Stearns, 655
6  F.3d at 1021 (internal quotation marks and citations omitted)
7  ("In a class action, standing is satisfied if at least one
8  named plaintiff meets the requirements."); see also Ellis I,
9  657 F.3d at 979 ("Because only one named Plaintiff must meet
10 the standing requirements, the district court did not err in
11 finding that Plaintiffs have standing.") Again presuming that
12 she still is a Food City hourly employee, plaintiff Martinez
13 has standing to represent the Rule 23(b)(2) injunctive relief
14 class as to working conditions.  See Ellis I, 657 F.3d at 987
15 ("[O]nly current employees have standing to seek injunctive
16 relief."  Ellis I, 657 F.3d at 988 (citing Dukes, 131 S.Ct. at
17 2559-60)).[45]

18     ### C.  Governing Legal Standards

19     Having found that one named plaintiff – Aurelia Martinez –
20 has standing as to the working conditions claim, the court can
21 now turn to the issue of possible decertification of that claim

22

23     [45]    In contrast to standing, Title VII exhaustion is a pre-condition
24 to bringing suit, and not jurisdictional.  Zipes v. Trans World Airlines,
   Inc., 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) (although
25 Title VII requires that plaintiffs timely exhaust administrative remedies,
   "filing a timely charge of discrimination with the EEOC is not a
26 jurisdictional prerequisite to suit in federal court, but a requirement
   that, like a statute of limitations, is subject to waiver, estoppel, and
27 equitable tolling[]").  For that reason, and because the parties did not
   raise the issue of exhaustion with respect to the working conditions claim,
28 the court declines to address it sua sponte.  See Mounts v. California,
   2009 WL 1084214, at *4 (E.D.Cal. April 22, 2009) ("The court is unaware of
   any authority that suggests that it has a sua sponte duty to address the
   issue of failure to plead exhaustion of administrative remedies.")

post-<u>Dukes</u>.   Decertification "is committed to the sound discretion of the district court."   <u>West World Travel, Inc. v. AMR Corp.</u>, 2005 WL 6523266, at *3 (C.D.Cal. Feb. 24, 2005) (citation omitted), <u>aff'd in part and rev'd in part on different grounds</u>, 265 Fed. Appx. 472 (9th Cir. 2008).   "[A] district court reevaluating the basis for certification may consider its previous substantive rulings in the context of the history of the case, and may consider the nature and range of proof necessary to establish the class-wide allegations." <u>Cruz v. Dollar Tree Stores, Inc.</u>, 2011 WL 2682967, at *3 (N.D.Cal. July 8, 2011) (internal quotation marks and citation omitted). Likewise, "district courts retain the authority to amend or decertify a class if, based on information not available or circumstances not anticipated when the class was certified, the court finds that either is warranted." <u>Dukes II</u>, 603 F.3d at 580 n. 4, <u>rev'd on other grounds</u>, <u>Dukes</u>, 131 S.Ct. 2541). Thus, "'[e]ven after a certification order is entered, the judge remains free to modify it in the  light of subsequent developments in the litigation[,]'" <u>United Steel Workers</u>, 593 F.3d at 809 (quoting <u>Falcon</u>, 457 U.S. at 160) (other citations omitted), including "changes in the law that make it no longer proper for a class to be maintained." <u>Estrella</u>, 2012 WL 214856, at *5 (internal quotation marks and citations omitted); <u>see also</u> <u>Brady v. Deloitte & Touche LLP</u>, 2012 WL 1059694, at *4-*8 (granting motion to decertify a class because the plaintiffs did "not show[] that the requirements of Rule 23(b)(3) [we]re met[]" after intervening Ninth Circuit and <u>Dukes</u> decisions).

1    "In considering the appropriateness of decertification,
2    the standard of review is the same as a motion for class
3    certification: whether the Rule 23 requirements are met."
4    Brady, 2012 WL 1059694, at *5 (N.D.Cal. March 27, 2012)
5    (citation omitted).   In Marlo v. United Parcel Serv., Inc.,
6    639 F.3d 942 (9th Cir. 2011), the Ninth Circuit found that on
7    defendant's decertification motion "[t]he district court . . .
8    properly placed the burden on [the plaintiff] to demonstrate
9    that Rule 23's class-certification requirements had been met."
10   Id. at 947-948.   Thus, in contrast to the standard motion
11   procedure where "the proponent of a motion bears the initial
12   burden of showing that the motion should be granted, the Ninth
13   Circuit rule is that the party resisting the motion bears the
14   burden of showing that the motion should not be granted."
15   Campbell v. PricewaterhouseCoopers, LLP, 287 F.R.D. 615, 619
16   (E.D.Cal. 2012) (citing Marlo., 639 F.3d at 947.[46]   That means
17   that here, the plaintiffs retain the burden of "showing that
18   class certification is still warranted[.]" Id.

19       As previously discussed, this court, along with many
20   others, is of the view that the Supreme Court's Dukes decision

21

22       [46]    Pre-Marlo, courts had held "that a party seeking *decertification*
     of a class should bear the burden of demonstrating that the elements of
23   Rule 23 have *not* been established." See, e.g.,   Slaven v. BP America,
     Inc., 190 F.R.D. 649, 651 (C.D.Cal. 2000) (emphasis in original); Gonzales
24   v. Arrow Fin. Servs. LLC, 489 F.Supp.2d 1140, 1153 (S.D.Cal. 2007).   Even
     post-Marlo, some courts have continued to allocate the burden in that way.
25   See, e.g., Dalton v. Lee Publications, Inc., 2013 WL 2181219, at *3
     (S.D.Cal. May 20, 2013) (citations omitted);   Cole v. CRST, Inc., 2012 WL
26   4479237, at *3 (C.D.Cal. Sept. 27, 2012); Estrella v. Freedom Financial
     Network, LLC, 2012 WL 214856, at *4 (N.D.Cal. Jan. 24, 2012). Given the
27   Ninth Circuit's unequivocal holding in Marlo, however, this court agrees
     that to the extent courts have  found that on a motion to decertify, it is
28   the defendant's burden to "demonstrat[e] that the elements of Rule 23 have
     not been established[,] . . . these cases are no longer good law." Negrete
     v. Allianz Life Ins. Co. of N.Am., 287 F.R.D. 590, 598 n. 1 (S.D.Cal. 2012)
     (internal quotation marks and citation omitted).

1    changed the legal landscape with respect to Rule 23(a)(2)'s

2    commonality requirement.  That change, which could not have

3    been anticipated when the working conditions class was

4    certified in 2005, is more than ample justification for

5    considering whether the working conditions class still can be

6    maintained in light of Dukes.

7        **D.   *Commonality***

8        Plaintiffs assert that "certification of the working

9    conditions claim remains proper[]" because in Parra I this

10   court "identified a discriminatory practice[,]" which "meets

11   the standards for Rule 23(a) commonality."  Pls.' Supp. Br.

12   (Doc. 302) at 25:16-17.  Disagreeing Bashas' asserts that

13   plaintiffs have failed to "identify a specific policy or

14   practice[,]" much less one that "could have *caused* [the]

15   challenged working conditions. Def.'s Supp. Br. (Doc. 301) at

16   14:21-22; and Def.'s Resp. (Doc. 304) at 5:16 (emphasis in

17   original).

18       The sole legal basis for plaintiffs' argument that they

19   have identified a discriminatory practice is the following

20   excerpt  from Parra I:

21               [P]laintiffs claim that [Bashas'] acted in
             a discriminatory manner by maintaining
22           disparate working conditions in their stores.
             Unlike the numerous claims of discrimination
23           articulated by the plaintiffs in *Monreal*,
             **Plaintiffs here allege one main claim**
24           **of a discriminatory practice or policy.**
             Although the facts of each individual complaint
25           may differ according to where and in what
             position the class member worked, viewed
26           together they form a general claim that
             [Bashas'] holds a discriminatory policy or
27           practice in relation to working conditions
             offered in its Food City stores.

28

     Id. at 25:7-8 (quoting Parra I, 2005 WL 6182338, at *20

1   (emphasis added by plaintiffs); <u>see</u> <u>also</u> Pls.' Reply (Doc. 303)

2   at 9:24 (same).  Significantly, plaintiffs do not attempt to

3   explain how the quoted rationale applies to the issue of Rule

4   23(a)(2) commonality, especially after <u>Dukes</u>.  Likewise,

5   Bashas' response did not address plaintiffs' reliance upon this

6   aspect of <u>Parra I</u>.

7       In any event, plaintiffs are disregarding the context of

8   the quoted rationale.  At that point in <u>Parra I</u>, the issue was

9   not Rule 23(a)(2) commonality,[47] as it is now.  Instead, the

10  issue was the certifiability of the working conditions claim

11  pursuant to Rule 23(b)(2).[48]  That Rule focuses on the relief

12  sought, and more particularly, the availability of injunctive

13  or declaratory relief to the class as a whole.  "The key to the

14  (b)(2) class is the *indivisible nature of the* injunctive or

15  declaratory *remedy* warranted — the notion that the conduct is

16  such that it can be enjoined or declared unlawful only as to

17  all of the class members or as to none of them."  <u>Dukes</u>, 131

18  S.Ct. at 2557   (internal quotation marks and citation omitted)

19  (emphasis added).  It strikes the court, however, that

20  indivisibility of the relief sought is a separate issue from

21  whether plaintiffs' working conditions claim satisfies Rule

22

23      [47]  Tellingly, despite the explicit finding in <u>Parra I</u> that "on the
24  issue of working conditions, the proposed class shares sufficient
    commonality to satisfy the minimal requirements of Rule 23(a)(2)[,]"
25  plaintiffs did not even mention, much less rely upon, that finding to
    establish commonality after <u>Dukes</u>.  <u>See</u> <u>Parra I</u>, 2005 WL 6182338, at *16.
26  The court is compelled to agree with plaintiffs' concession, albeit
    implicit, that the <u>Parra I</u> commonality finding could not withstand scrutiny
27  in light of <u>Dukes</u>.

28      [48]  Seeming to recognize that distinction, plaintiffs' reply argues
    that "this court properly certified the working conditions claim *under Rule
    23(b)(2)*[.]" Pls.' Reply (Doc. 303) at 6:18 (emphasis omitted) (italicized
    emphasis added).  But again, that is not the issue now.

23(a)(2)'s commonality requirement, particularly in the wake of <u>Dukes</u>.

To be sure, "it is sufficient to meet the requirements of Rule 23(b)(2) that class members complain of a pattern or practice that is generally applicable to the class as a whole." <u>Rodriguez v. Hayes</u>, 591 F.3d 1105, 1125 (9th Cir. 2010) (internal quotation marks and citations omitted).  By the same token, however, plaintiffs did not offer any legal support, and research did not reveal any, to support the view that just because Rule 23(b)(2) has been satisfied, so, too, has Rule 23(a)(2)'s commonality requirement.  Therefore, the court is not convinced that its Rule 23(b)(2) rationale in <u>Parra I</u>, standing alone, supports a finding that plaintiffs have satisfied <u>Dukes</u>' commonality standards.  Accordingly, plaintiffs have not met their burden of "affirmatively demonstrating" their compliance with Rule 23(a)(2), <u>Dukes</u>, 131 S.Ct. at 2551, and, concomitantly, that the working conditions class still should be certified.

There are two other deficits in plaintiffs' attempt to show commonality which are particularly noteworthy after <u>Dukes</u>, as Bashas' points out.  The first is plaintiffs' failure to show that their working conditions claim "depend[s] upon a common contention . . . that is capable of classwide resolution[.]" <u>See</u> <u>Dukes</u>, 131 S.Ct. at 2551.  Unlike plaintiffs' equal pay claim where, as discussed herein,  "examination of all the putative class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*[,]" plaintiffs have not made a similar showing as to their working conditions claim.  <u>See</u>

id. at 2552 (emphasis in original).  In originally moving
for class certification, plaintiffs did list a number of
alleged common issues of law and fact.  See Pls.' MCC (Doc.
159) at 19:22-21:12.  But, in contrast to their pay claim,
plaintiffs have not explained how continued class
certification of the working conditions claim has "the
capacity . . . to generate common answers apt to drive the
resolution of th[is] litigation."  See Dukes, 131 S.Ct. at
2551 (internal quotation marks and citation omitted)
(emphasis in original).

   That omission is intertwined with the second weakness in
plaintiffs' commonality proof – the insufficiency of their
anecdotal evidence.  The Dukes Court held that "significant
proof that Wal-Mart operated under  a general policy of
discrimination" was entirely absent; and hence, plaintiffs
did not establish commonality.  Dukes, 131 S.Ct. at 2553
(internal quotation marks omitted).  In Dukes, plaintiffs
attempted to "identif[y] a common mode of exercising
discretion that pervade[d] the entire company" by relying
upon, inter alia, anecdotal evidence.  Dukes, 131 S.Ct. at
2555-56.  There, the anecdotes amassed ("120 affidavits
reporting experiences of discrimination  – about 1 for every
12,500 class members – relating to only 235 out of Wal-Mart's
3,4000 stores") were relatively small given the class size
(1.5 million).  Further, although the plaintiffs alleged that
Wal-Mart discriminated nation-wide, "more than half of the"
anecdotes  were "concentrated in only six States. . . ; half
of all States ha[d] only one or two anecdotes; and 14 States

1  ha[d] no anecdotes about Wal-Mart's operations at all." <u>Id.</u>

2  at 2556 (citation omitted).  The <u>Dukes</u> Court thus held that

3  "[e]ven if every single one of th[o]se accounts [wa]s true,

4  that would not demonstrate that the entire company operate[s]

5  under a general policy of discrimination, . . . which is what

6  respondents must show to certify a companywide class." <u>Id.</u>

7  (internal quotation marks, citation and footnote omitted).

8      The anecdotal evidence in the present case is similarly

9  weak.  In 2004, Food City had 58 stores. Def.'s exh. 1

10 (Proulx Aff.) at 3, ¶ 8.  Yet, plaintiffs are relying upon

11 only 11 declarations from putative class members, and two

12 other declarations.  Those declarations, from current and

13 former Food City employees, describe purportedly substandard

14 working conditions in at most nine of the 58, or 15.5%, of

15 Food City stores.  Moreover, four of those declarations

16 pertain to Food City store 59 which is "now closed." Def.'s

17 Supp. Br. (Doc. 301) at 6:25 (emphasis omitted).  The thrust

18 of those declarations is that Food City stores have issues

19 with rodents, roaches, and poorly maintained equipment and

20 work areas.   As in <u>Dukes</u>, however, even assuming the

21 veracity of all 13 of those accounts, "that would not

22 demonstrate that [Bashas'] operate[s] under a general policy

23 of discrimination" with respect to working conditions at its

24 Food City stores.  <u>See</u> <u>Dukes</u>, 131 S.Ct. at 2556 (internal

25 quotation marks and citation omitted).

26     Besides the relatively few proffered declarations,

27 evidence is lacking "that the *entire class* was subject  to

28 the same allegedly discriminatory practice[.]" <u>Ellis I</u>, 657

F.3d at 983 (emphasis added).  Such evidence is lacking, in

part,  because the record includes more than 80

countervailing declarations from Food City employees, many of

them Hispanic, from at least 33 different stores.   See

generally Def.'s Resp. MCC (Doc. 190), exh. 50-135 thereto.

This broader spectrum of proof readily shows that not all

Food City stores are as plaintiffs depict through their few

selective declarations.

     This is not surprising given the acquisition history of

the Food City stores.  As delineated in the affidavit of

Michael Proulx, Bashas' Executive Vice President and Chief

Operating Officer, Def.'s Resp. MCC (Doc. 190), exh. 3

thereto at 4:17-18, in the decade between 1994 and 2004,

Bashas' rapidly "expanded[,] . . . , most notably in the Food

City format[.]" Id., exh. 1 thereto (Proulx Aff.) at 2, ¶ 8.

For example, in 1996, Bashas' acquired 16 Mega Foods stores,

twelve of which eventually became Food City stores.  Id. at

4, ¶ 11.  "Those stores were in vastly varying conditions."

Id. at 4, ¶ 12.  "Some . . . were relatively new and in good

condition."  Id. "Others were older stores that had

significant facility issues."  Id. That was also the

situation when "[a]round 2001, Bashas' purchased some ABCO

stores, some of which were converted to Bashas' stores and

some of which were converted to Food City stores."  Id. at 4,

¶ 14.  "Again, these stores were in a variety of different

conditions, ranging from being in good shape to needing much

improvement."  Id.

     This acquisition history is significant because, inter

*alia*, it further demonstrates the lack of a common answer to the question of why was I disfavored as to working conditions.   Plaintiffs' meager anecdotal evidence, especially when read in the context of the acquisition history of Food City stores, "is too weak to raise any inference that" the working conditions at all Food City stores were substandard because those stores employ a higher percentage of Hispanics than do A.J.'s and Bashas'.   See Dukes, 131 S.Ct. at 2556.   In short, plaintiffs have not, as they must post-Dukes, shown that "there was 'significant proof that [Bashas] operated under a general policy of discrimination[]'" with respect to working conditions that could "affect the class as a whole."   Ellis I, 657 F.3d at 983 (quoting Dukes, 131 S.Ct. at 2553.   Accordingly, because it cannot survive Dukes, the court decertifies the working conditions class previously certified in Parra I.

In sum, for all of the reasons set forth herein, the court grants plaintiffs' motion for class certification as to the pay claim for monetary damages pursuant to Fed.R.Civ.P. 23(b)(3), on behalf of current and former employees.   Named plaintiffs Gonzalo Estrada and Aurelia Martinez shall serve as the class representatives for that class.   The court decertifies the working conditions class previously certified in Parra I, however.

## III.   Rule 23(f)

Presumably, Bashas' is continuing to  "request[]" that upon class certification, this court "*recommend the acceptance* of a Rule 23(f) appeal."   See Def.'s Resp. MCC

(Doc. 190) at 82:14 (emphasis added).  That Rule states, in relevant part, that "[a] *court of appeals* may permit an appeal from an order granting or denying class-action certification under this rule if a petition for permission to appeal is filed with the *circuit clerk* within 14 days after the order is entered."  Fed.R.Civ.P. 23(f) (emphasis added).  Given the unequivocal language of that Rule, this court disagrees with Bashas' reading thereof.  The authority to permit an appeal from an order denying or granting of class certification lies with the court of appeals  – not with the district court.  It is equally clear that Rule 23(f) does not contemplate a recommendation of such an appeal, as Bashas' urges.  The court thus denies Bashas' request that this court recommend to the Ninth Circuit that it accept an immediate appeal of the class certification decision herein.

Relatedly, the court likewise presumes that Bashas' continues to seek a stay "pending Ninth Circuit action." Def.'s Resp. MCC (Doc. 190) at 82:15.  This court does retain jurisdiction to stay its own order pending appeal. See Fed.R.App.P. 8(a).  However,  Bashas' has not explicitly moved for such relief, and has not addressed the four-factor balancing test which this Circuit applies in evaluating whether to issue a stay.  See Leiva-Perez v. Holder, 640 F.3d 962, 964 (9th Cir. 2011).  Thus, to the extent Bashas' motion can be read as seeking a stay pending appeal, the court denies such relief.

. . .

1

*Conclusion*

2       Accordingly, the court hereby **ORDERS** that Plaintiffs'

3  Motion for Class Certification (Doc. 159) is **GRANTED** to the

4  extent they are seeking certification of a class with

5  respect to pay pursuant to Fed.R.Civ.P. 23(b)(3).  In that

6  regard, the court certifies a class as follows:

7               All Hispanic workers currently and formerly
           employed by defendant Bashas' Inc. in an hourly
8          position at any Food city retail store since
           April 4, 1998, who have been subject to the
9          challenged pay policies and practices.

10      **IT IS FURTHER ORDERED** that the working conditions claim

11  is **DECERTIFIED**; and

12      **IT IS FINALLY ORDERED** that in conformity with

13  Fed.R.Civ. P. 23(c)(2)(B), within **thirty (30) days** of the

14  date of entry of this order, the parties shall submit

15  jointly an agreed upon form of notice, a joint proposal for

16  dissemination of the notice, and the time-line for opting

17  out of the action.  Plaintiffs must bear the costs of the

18  notice, which shall include mailing by first-class mail.

19      DATED this 31th day of May, 2013.

20

21

22  _____
       Robert C. Broomfield
23     Senior United States District Judge

24

25

26

27  Copies to all counsel of record

28